new
530

1  ## PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

2  Name __Core_____ __Stephen_____ __M____

3       (Last)         (First)       (Initial)

*FILED*

3  Prisoner Number __D-19109_____

4  Institutional Address __P.O. Box 689 / GW-245-U__

JUL - 9 2008

RICHARD W.
CLERK, U.S. D
ERN DIST

5

6

7  ### UNITED STATES DISTRICT COURT
   ### NORTHERN DISTRICT OF CALIFORNIA

8  Stephen M. Core

   (Enter the full name of plaintiff in this action.)

**CV 08    3308**

9           vs.

10  Ben Curry et., al _____

    Case No. _____
    (To be provided by the clerk of court)

11  _____

    **PETITION FOR A WRIT
    OF HABEAS CORPUS**

*RMW*

12  _____

13  _____

14  (Enter the full name of respondent(s) or jailor in this action)

*(PR)*

**E-filing**

15

16  ### Read Comments Carefully Before Filling In

17  __When and Where to File__

18      You should file in the Northern District if you were convicted and sentenced in one of these

19  counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20  San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21  this district if you are challenging the manner in which your sentence is being executed, such as loss of

22  good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23      If you are challenging your conviction or sentence and you were __not__ convicted and sentenced in

24  one of the above-named fifteen counties, your petition will likely be transferred to the United States

25  District Court for the district in which the state court that convicted and sentenced you is located. If

26  you are challenging the execution of your sentence and you are not in prison in one of these counties,

27  your petition will likely be transferred to the district court for the district that includes the institution

28  where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS    - 1 -

1  Who to Name as Respondent

2        You must name the person in whose actual custody you are.  This usually means the Warden or

3  jailor.  Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced.  These are not proper

5  respondents.

6        If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11        1.  What sentence are you challenging in this petition?

12             (a)    Name and location of court that imposed sentence (for example; Alameda

13                    County Superior Court, Oakland):

14        Kern County Superior Court        Kern County

15        Court                                    Location

16             (b)    Case number, if known    KER29898

17             (c)    Date and terms of sentence    12/10/85  15-years-to-life

18             (d)    Are you now in custody serving this term?  (Custody means being in jail, on

19                    parole or probation, etc.)        Yes  xx    No ____

20                    Where?

21             Name of Institution:    Correctional Training Facility

22             Address:  P.O. Box 689, Soledad, CA.93960-0689

23        2.  For what crime were you given this sentence?  (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known.  If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26        Penal Code §187 (second degree murder)

27

28

3. Did you have any of the following?

Arraignment:                                    Yes _XX_      No ____

Preliminary Hearing:                            Yes _XX_      No ____

Motion to Suppress:                             Yes ____      No _XX_

4. How did you plead?

Guilty ____    Not Guilty ____    Nolo Contendere _XX_

Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

Jury ____      Judge alone ____    Judge alone on a transcript _XX_

6. Did you testify at your trial?                Yes ____      No _XX_

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment                           Yes _XX_      No ____

    (b)    Preliminary hearing                   Yes _XX_      No ____

    (c)    Time of plea                          Yes _XX_      No ____

    (d)    Trial                                 Yes ____      No _XX_

    (e)    Sentencing                            Yes _XX_      No ____

    (f)    Appeal                                Yes ____      No _XX_

    (g)    Other post-conviction proceeding      Yes _XX_      No ____

8. Did you appeal your conviction?               Yes ____      No _XX_

    (a)    If you did, to what court(s) did you appeal?

           Court of Appeal                       Yes ____      No ____

           Year: _____      Result: _____

           Supreme Court of California           Yes ____      No ____

           Year: _____      Result: _____

           Any other court                       Yes ____      No ____

           Year: _____      Result: _____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

1    petition?                                           Yes _____    No _____

2    (c)    Was there an opinion?                        Yes _____    No _____

3    (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                        Yes _____    No _____

5    If you did, give the name of the court and the result:

6    _____

7    _____

8    9.  Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?          Yes _____    No _____

10    [Note:  If you previously filed a petition for a writ of habeas corpus in federal court that

11    challenged the same conviction you are challenging now and if that petition was denied or dismissed

12    with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13    for an order authorizing the district court to consider this petition.  You may not file a second or

14    subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28

15    U.S.C. §§ 2244(b).]

16    (a)    If you sought relief in any proceeding other than an appeal, answer the following

17    questions for each proceeding.  Attach extra paper if you need more space.

18    I.    Name of Court: _____

19    Type of Proceeding: _____

20    Grounds raised (Be brief but specific):

21    a. _____

22    b. _____

23    c. _____

24    d. _____

25    Result: _____    Date of Result: _____

26    II.    Name of Court: _____

27    Type of Proceeding: _____

28    Grounds raised (Be brief but specific):

1  a._____

2  b._____

3  c._____

4  d._____

5  Result:_____ Date of Result:_____

6  III.  Name of Court: _____

7  Type of Proceeding: _____

8  Grounds raised (Be brief but specific):

9  a._____

10  b._____

11  c._____

12  d._____

13  Result:_____ Date of Result:_____

14  IV.  Name of Court: _____

15  Type of Proceeding: _____

16  Grounds raised (Be brief but specific):

17  a._____

18  b._____

19  c._____

20  d._____

21  Result:_____ Date of Result:_____

22  (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23  Yes _____    No_____

24  Name and location of court: _____

25  B. GROUNDS FOR RELIEF

26  State briefly every reason that you believe you are being confined unlawfully.  Give facts to

27  support each claim.  For example, what legal right or privilege were you denied?  What happened?

28  Who made the error?  Avoid legal arguments with numerous case citations.  Attach extra paper if you

1   need more space. Answer the same questions for each claim.

2        [Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent

3   petitions may be dismissed without review on the merits.  28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467,  111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5        Claim One:_____SEE ATTACHED PETITION_____

6        _____

7        Supporting Facts:_____SEE ATTACHED PETITION_____

8        _____

9        _____

10       _____

11       Claim Two:_____SEE ATTACHED PETITION_____

12       _____

13       Supporting Facts:_____SEE ATTACHED PETITION_____

14       _____

15       _____

16       _____

17       Claim Three:_____SEE ATTACHED PETITION_____

18       _____

19       Supporting Facts:_____SEE ATTACHED PETITION_____

20       _____

21       _____

22       _____

23       If any of these grounds was not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25       _____SEE ATTACHED PETITION_____

26       _____

27       _____

28       _____

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3    of these cases:

4    _____SEE ATTACHED PETITION_____

5    _____

6    _____

7    Do you have an attorney for this petition?                    Yes_____    No XX

8    If you do, give the name and address of your attorney:

9    _____

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on ___6/30/08___              _____

14                    Date                         Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

STEPHEN M. CORE

     Petitioner,

   v.

BEN CURRY, Warden

    Respondent.

Case No. _____

---

**PETITION** FOR WRIT OF HABEAS CORPUS;

MEMORANDUM OF POINTS & AUTHORITIES;

EXHIBITS

---

Stephen M. Core
P.O. Box 689/GW-245-U
CTF Central Facility
Soledad, CA.93960-0689

Petitioner in pro per

# TABLE OF CONTENTS

Petition For Writ Of Habeas Corpus                                    1

Procedural History; Administrative & Judicial Remedies               2

    The Petition is Timely                                        2

    Petitioner is in Custody                                      2

    Exhaustion of Administrative Remedies                         2

    Exhaustion of State Court Remedies                            2

    Jurisdiction and Venue                                        2

Commitment Offense                                              3,4,5,6

2006 Parole Hearing                                                   7

Petitioner's Psychological Evaluations                           7,8,9

History Of The Case                                                  10

Jurisdiction Of The Case                                            10

Requirements of Due Process; Standard of Review                  12,11

Memorandum Of Points And Authorities                                13

    THE DECISION TO FIND PETITIONER UNSUITABLE FOR A
    PAROLE DATE IS AN ABUSE OF DISCRETION AND VIOLATES
    DUE PROCESS WHEN IT CANNOT BE SUPPORTED BY ANY EVID-
    ENCE IN THE RECORD SHOWING HIM TO BE A CURRENT TH-
    REAT TO PUBLIC SAFETY, AND THEREFORE THERE IS NO
    LEGAL BASIS TO DENY PAROLE.                                14,13

    a.) THE FACTUAL EVIDENCE DOES NOT SUPPORT THE BOARD'S
        STATED REASONS FOR DENYING PAROLE.                   15,16

    b. THERE IS NOT "SOME EVIDENCE" THAT CORE COMMITTED
       HIS OFFENSE IN A MANNER SHOWING HE IS UNSUITABLE
       FOR RELEASE.                                   16,17,18,19

    c. A CALIFORNIA PRISONER WITH A SENTENCE OF A TERM OF
       YEARS TO LIFE WITH THE POSSIBILITY OF PAROLE HAS A
       PROTECTED LIBERTY INTEREST IN RELEASE ON PAROLE AND
       THEREFORE A RIGHT TO DUE PROCESS IN THE PAROLE SUIT-
       ABILITY PROCEEDINGS.                        19,20,21,22,23

Conclusion                                                          23
Prayer For Relief                                                   24

## TABLE OF EXHIBITS

Exhibit 1   Kern County Superior Court order denying habeas corpus

Exhibit 2   Court of Appeal order denying habeas corpus

Exhibit 3   California Supreme Court order denying habeas corpus

Exhibit 4   Probation Officer's Report, November 19, 1985

Exhibit 5   Psychological Evaluation Reports, 08/29/88;01/01/93;
            06/01/98;10/10/00;03/07/02;01/09/04.

## TABLE OF AUTHORITIES

**Cases**

Biggs v. Terhune (9th Cir 2003) 334 F.3d 910,916-917..... 11,12

Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.
(9th Cir. 1988)149 F.3d 971, 982 ......................... 20

Daniels v. Williams (1986) 474 U.S. 327, 331............... 13

Dent v. West Virginia (1987) 129 U.S. 114, 123............. 13

Dunn v. U.S Parole Comm. (10th Cir., 1987) 818 F.2d 742, 745.14

Hayward v. Marshall (9th Cir. 2008) 512 F.3d 536...... 20,21,22

Hudson v. Kane (N.D. Ca. 2005) __ F. Supp. 2d.__,2005
WL2035590.................................................. 11

In re Caswell (2001) 92 Cal. App. 4th 1017, 1029............14

In re Cooper (2007) 153 Cal. App. 4th 1063 ................ 15

In re Dannenberg (2005) 34 Cal. 4th 1061, 1084............. 13

In re Dannenberg (2007) 156 Cal. App. 4th 1399 .......... 14,23

In re Elkins (2006) 144 Cal. App. 4th 475, 496 .......... 19,23

In re Lawrence (2007) 150 Cal. App. 4th 1511, 1543 ...... 18,19

In re Lee (2006) 143 Cal. App. 4th 1409 ................. 15,23

In re Montgomery (2007) 156 Cal. App. 4th 930 .......... 18,22

In re Powell (1988) 45 Cal. 3d. 894, 904 ................. 13

# TABLE OF AUTHORITIES

## (continued)

In re Rosenkrantz (2002) 29 Cal. 4th 616, 621 ......... 11,13,16

In re Scott (2004) 119 Cal. App. 4th 894 ................ 15

In re Scoot (2005) 133 Cal. App. 4th 573, 594-595 ......... 19

In re Singler (2008) DJDAR 4201 ......................... 23

In re Smith (2003) 109 Cal. App. 4th 489, 505 ............. 14

Irons v. Warden of California State Prison-Solano,
(E.D. Ca. 2005) 358 F.2d 936,947 ...................... 11

Irons v. Carey (9th Cir. 2007) 479 F.3d 658, 662 ........... 12

Irons v. Carey (2007) 505 F.3d 851 ...................... 21

McQuillion v. Duncan (9th Cir. 2002) 306 F.3d 895, 901-903 ....
....................................................11,12,13,14,20

People v. Ramirez (1979) 25 Cal. 3d 260 .................. 10

Quaglito v. Sullivan (D. Minn., 1989) 719 F. Supp.
860, 864 ............................................. 14

Rosenkrantz v. Marshall (2006) 444 F. Supp 2d 1063 ......... 19

Sass v. Calif. Bd. of Prisin Terms (9th Cir. 2006)
461 F.3d 1123,1128 .................................. 12

Superintendent v. Hill, 472 U.S. 445, 457 (1985)........... 12,13

Wolff v. McDonnell (1974) 418 U.S. 539, 536-67........... 12,13

**Statutes**

Pen. C. § 3041 ............................... 11,14,17,20

**Regulations**

15 CCR § 2402................................. 7,14,17

15 CCR § 2280 ...................................... 11

**Constitutional Provisions**

Cal. Const., art. I, §7 ................................. 17

Stephen M. Core D-19109
P.O. Box 689/GW-245-U
CTF Central Facility
Soledad,CA.93960-0689

IN PRO PER

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: STEPHEN M. CORE | CASE NO. _____ |
| Petitioner | PETITION FOR WRIT OF HABEAS CORPUS AND MEMORANDUM OF |
| ON HABEAS CORPUS | POINTS AND AUTHORITIES IN SUPPORT THEREOF. |
| _____/ | |

## PETITION FOR WRIT OF HABEAS CORPUS

**TO: THE HONORABLE UNITED STATES DISTRICT JUDGE OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA.**

Based on the facts, grounds, argument, authorities and exhibits herein, petitioner, Stephen M. Core in Propria Persona respectfully seeks habeas corpus relief in an order

(a)  Vacating Board of Parole Hearings (hereafter BPH) action of August 9, 2006, that denied parole based entirely upon the co-mmitment offense.

//

//

//

1.

Petitioner, by way of this writ does not contest or challenge his conditions of confinement at the Correctional Training Facility, Soledad, California. Rather, petitioner, by way of this writ does contest and challenge the violations of rules, regulations, California Penal Codes, State and Federal case laws, and denial of protection of due process, equal protection, and cruel and/or unusual punishment under both State and Federal Constitutions.

### PROCEDURAL HISTORY; ADMINISTRATIVE REMEDIES

The Petition is Timely. The California Supreme Court denied petition for writ of habeas corpus on June 11, 2008. Exhibit 3. AEDPA time constraints have been met.

Petitioner is in Custody. Petitioner is housed by the Department of Corrections at the Correctional Training Facility (CTF) Soledad, California, Ben Curry, Warden.

Exhaustion of Administrative Remedies. California provides no administrative remedy for unconstitutional action by a Board of Parole Hearings.

Exhaustion of State Court Remedies. The Kern County Superior Court denied a habeas corpus petition (case no. HC009737A) on January 31, 2007. Exhibit 1. The California Court of Appeal, Fifth District, denied a petition raising the instant claims (case no. F052946) on November 29, 2007. Exhibit 2. The California Supreme Court denied a habeas corpus petition (case no. S159-240) on June 11, 2008. Exhibit 3.

Jurisdiction And Venue. This Court has jurisdiction and is the proper venue. 28 USC §2241(d). Petitioner is confined at CTF, Soledad, California.

## COMMITMENT OFFENSE

The following are statements taken from November 1, 1985 Probation Report and submitted as Exhibit 4. pp.3-8).

On July 3, 1985, a customer entered into the Rocket Site, Mini-mart, in Boron, California, when the store clerk refused to respond to the cash register to accept the customer's money, the customer went into the store's office and observed Mr. Kang, store clerk, lying on the floor in a pool of blood. The customer immediately contacted the Kern County Sheriff's Office via telephone. Later, the officers arrived at the scene and noted the victim was lying on his side located in the store's office. There appeared to be a gunshot wound to the victim's left cheek. The body was examined by a criminalist and noted that it appeared that the victim had been lying face down on the floor when he was shot and possibly shoved into a corner, partially rolled over. In addition, the weapon used was noted as a sawed-off shotgun The daughter of the victim arrived at the scene and advised the officers that her father always carried a wallet containing numerous credit cards along with identification cards. The wallet was noted to be missing. The officers searched the area outside the store and found an identification card with the victim's picture. At that point, officer's continued their investigation. On July 7, 1985, officers received numerous telephone calls from several unidentified individuals stating that Andrew Avila, Neil Core and Mr. Stephen Core were responsible for the homicide/robbery. It was reported Andrew Avila was reportedly bragging about the shooting. Another individual informed officers that when the Core brothers

1 had been intoxicated, they had told about how they and another

2 individual had been involved in the robbery/shooting. They had

3 reportedly stated that they acted as lookouts while the other in-

4 dividual committed the robbery.

5 On July 5, 1985, it was decided that the Core brothers and

6 Andrew Avila should be located and taken into custody for quest-

7 ioning. Both Steven and Neil Core consented to talk with the off-

8 icers and have the interview tape-recorded.

9 At first, Neil Core denied any knowledge of the robbery/

10 murder; however, by conclusion of the interviews, both Core bro-

11 thers had stated substantially the following:

12 The robbery/murder was actually committed by Andrew Avila;

13 however, both Core brothers were involved in the area when the

14 robbery/murder took place.

15 Andrew Avila had previously expressed a desire to commit

16 the robbery and had expressed a desire to "blow away" the clerk.

17 On the evening before the crime took place, all three subjects had

18 been at the residence of Neil and Steven Core. Neil Core had a

19 motorcycle for sale, which Andrew Avila wanted to purchase, but

20 could not because he didn't have any money. Partly for that reason

21 but not for that reason alone, Avila decided to go ahead with the

22 robbery. Avila obtained a 20-gauge sawed-off shotgun belonging to

23 Neil Core, which was in the residence Avila advised the Core bro-

24 thers that he was going to commit the robbery with or without th-

25 em.

26 Both brothers maintained that they pleaded with Avila not

27 to commit the robbery; however, they both subsequently accompan-

28 ied Avila when he walked to the store to commit the robbery. Neil

1  Core had a sawed-off .22 rifle in his possession at that time,

2  Avila entered the store alone with the sawed-off shotgun. A few

3  minutes later, the sound of a shotgun blast was heard and shortly

4  after that, Avila ran from the store. Upon leaving the store,

5  Avila reportedly stated, I Knocked him off.

6       After the robbery, Avila and the Core brothers returned to

7  the Cores' residence. Upon arriving at the residence, Avila re-

8  portedly split the money taken in the robbery three-ways, also

9  giving Neil Core $100.00 for the motorcycle. He gave Steven Core

10  the victim's wallet, to dispose of. Steven Core stated that he

11  put the wallet in a hole in his house. Avila also reportedly

12  gave the Core brothers the pantyhose, which he had been wearing

13  over his face, to be disposed of, as well as the shotgun. He th-

14  en changed clothes and left.

15       During the interviews, Steven and Neil Core signed a cons-

16  ent-to-search form for their residence. Upon completing the inter-

17  views, the officers went to their residence for the purpose of

18  searching it. In a hole in a wall, officers located the victim's

19  wallet as the Cores had described. From the attic, officers seiz-

20  ed a 20-gauge sawed-off shotgun and a .22caliber sawed-off rifle,

21  along with numerous rounds of .22 caliber and 20-gauge shotgun

22  ammunition. In a subsequent interview, Neil Core described to

23  officers how Avila had cut the legs off a pair of pantyhose, put

24  the pantyhose over his head, then cut out eye-holes. Neil Core

25  stated he had also had pantyhose over his head.

26       Also on the evening of July 5, 1985, officers located and

27  arrested Andrew Avila. Avila refused to discuss the crime with

28

officers and the interview was terminated. It is noted that from the time immediately after the robbery/murder until approximately July 18, 1985, during the investigation of the crime, officers talked to numerous people in the Boron area and obtained various bits of information from them.

Numerous people advised officers that they had heard Avila brag about committing the robbery and shooting the victim, and also stated that the Core brothers had been involved.

Another individual stated that before the robbery, he had heard Neil Core state that they should "rip off" the market. The same individual stated that Avial had told him later that he had committed the murder and also threatened to kill the individual if he told anyone.

Another individual advised officers that before the crime occurred, Neil Core had stated that Avila was going to "blow someone away." The same individual told officers that on the morning after the crime, Neil Core stated that Avila had committed the murder. Several individuals reported to officers that Avila had stated that he shot the victim when he thought the victim had seen his tattoos.

An autopsy performed on the victim's body revealed that the cause of death was "asphyxia, due to upper respiratory obstruction by blood due to a penetrating shotgun wound to the cheek."

Andrew Avila is presently pending trial in Kern County Superior Court, charged with First Degree Murder. The District Attorney's Office indicates an intention to seek the death penalty for Avila. Neil Core is pending sentencing for second degree murder.

## 2006 PAROLE HEARING

On August 9, 2006, a panel of the Board of Parole Hearings considered the matter of Stephen M. Core (hereafter petitioner) suitability for parole.

The panel found petitioner unsuitable for parole, concluding he would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.

First, the panel noted that the offense was carried out in an especially cruel and callous manner. (Cal. Code Regs., tit. 15 §2402, subd. (c)(1).)

Second, the panel noted that the offense was carried out in a very dispassionate and calculated manner, demonstrating an especially callous disregard for human suffering in that the victim was shot in the head and died as a result of the asphyxia due to respiratory obstruction by blood. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)(B)(D).)

Third, the panel noted that petitioner has no previous record and that this was your only arrest. And in conclusion, the panel noted petitioner accummulated eleven 128-A counseling chronos and nine disciplinary reports. The last being November 18, 2002, and we noted that for the record that none of them involved any violence

## PETITIONER'S PSYCHOLOGICAL EVALUATIONS

On 8/29,88, a report prepared by Juhan Liikane, M.D. concludes in his report, neither the available record nor the inmates personal presentation points to evidence for thinking of him with any greater potential for violent behavior or types of criminality than the

7.

average citizen possesses. Aside from these general comments and advise
to refrain from psychoactive substances, there are no further psychia-
trically considerations in regard to the question of parole readiness.

On September 23, 1991, George Maloof, M.D. draws the same conclu-
sion.

In a reported dated January 1994, Carolyn Gale, Ph.D. concludes
His violence potential is considered to be somewhat less than average.
During observation in this institution he has psychiatrically improved
slightly and avoided substance abuse. In a less controlled setting such
as return to the community this inmate is considered likely to hold pr-
esnt gainsesent gains.

On June 1, 1998, Margaret M. Wall, Ph.D. concludes: Mr. Core does
not suffer from any psychiatric or psychological illness. Based on this
evaluation, if at large, Mr. Core presents an average level of risk to
the safety and welfare of community members (on the condition he is fr-
ee from drugs and alcohol use). This is premised on his history of ad-
equate adjustment prior to the instant offense, no prior history of co-
nduct disordered or violent behavior, feelings of guilt/remorse for the
instant offense, and insight into his psychological vulnerability.

On October 10, 2000, J. Katzman, Ph.D. states: It appears that Mr.
Core is remorseful about the crime, his participation, and the victim's
suffering. It also appears that he realizes the extent to which his dr-
ug abuse contributed to his poor judgment and impulsiveness, and how
these related to crime of murder. Mr. Core seems to motivated towards
rehabilitating himself--he has apparently been drug free for the past
3 years. There appears to be no indication that he has been involved in
violent behavior while imprisoned. His religious beliefs appear to be
guiding him in a positive direction that reduces his potential for in-

8.

volvement in crime.

This examiner believes that Mr. Core is in a good position to follow through with a sucessful parole if he continues to remain drug free and seeks further treatment. At this time, he appears to be an average to less than average risk of committing a dangerous act in prison and in the community outside of prison. Of course, if he returns to drug use, this risk factor will rise significantly above the average mark.

On March 7, 2002, Katharine K. Wilson, Ph.D. <u>ASSESSMENT OF DANGEROUSNESS</u>: There is nothing in Mr. Core's criminal history that would suggest that he would pose a danger to others. It appears that he was induced by two older people to assist in carrying out the life crime. His involvement with drugs impaired his judgment and his desire for the next "high" made him vulnerable to the robbery plan. Mr. Avila promised 1/3 of the loot to him and this meant instant cash for drugs. In his mind, Mr. Core was planning to assist Mr. Avila in a tangential way by being the lookout for a robbery plot but not for a murder plan.

On November 7, 2003, E.W. Hewchuk, Ph.D. did an updated psychological evaluation for the Board of Prison Terms (Now the Board of Parole Hearings) on inmate Stephen Core. In his report the doctor states: Since his last formal psychological evaluation for the Board of Prison Terms, inmate Core has continued to program well within a correctional setting. He has now served over 18 years of his sentence, and recently completed landscaping certification. Two years ago, he was assigned a **low risk factor** within a controled setting and within the community, perdicting that risk remains no higher than the average citizen. Core remains a suitable, **low-risk** candidate for parole. Ex 5.

9.

## HISTORY OF THE CASE

On or about December 10, 1985, the Superior Court Of California, For The County of Kern (case no. KER29898) imposed the prescribed term of 15-years-to-life with the possibility of parole after finding him guilty of second degree murder. His Minimum Eligible Parole Date (hereafter MEPD) was set for May 24, 1995. He was received by the California Department of Corrections And Rehabilitation (hereafter CDCR) on October 10 1985, from Kern County.

On August 9, 2006, the BPH held petitioner's sixth parole hearing and found he was unsuitable for parole for his involvement in the 1985 robbery/murder committed by his co-defendant (Andrew Avila) in which he was induced to be a 'lookout' for his co-defendant. The Board found petitioner was a current threat to public safety and therefore deferred parole for one year.

## JURISDICTION OF THE CASE

Petitioner has exhausted all state court remedies. Thus, petitioner having been placed in jeopardy and danger of irreparable harm, this court has jurisdiction and is the proper venue. 28 USC §2241(d).)

There is no issue of "comity" since both state and federal due process standards are offended. This particularly true since California standard of due process is more strongly protective of the individual (People v. Ramirez (1979) 25 Cal. 3d 260

## REQUIREMENTS OF DUE PROCESS;

## STANDARD OF REVIEW

1.  State parole statutes and regulations bestowed on indeterminately sentenced inmates a liberty interest in parole protected by due process. McQuillion v. Duncan, 306 F.3d 895, 901-903 (9th Cir. 2002) [McQuillion]; In re Rosenkrantz, 29 Cal, 4th 616,621 (2002) [Rosenkrantz.)

2.  Petitioner's liberty interest has long required his grant of parole because his minimum eligible parole date has lapsed and he had been repeatedly evaluated to pose no further risk to public safety. Penal Code. §3041 (a); 15 CCR §§2280, 2281 (a).

3. Although factors of particulary egregious commitment offense may be a sufficient ground for unsuitability initially (Rosenkrantz, 29 Cal. 4th at p.679), each ground for unsuitability must be supported by relevant, reliable evidence (Id., p.658; 15 CCR §2402 (b)), and offense, facts and other unchangeable factors may not serve to deny parole repeatedly or interminably to a parole qualified inmate, extinguishing the possibility of parole. Biggs v. Terhune, 334 F.3d 910,916-917 (9th Cir. 2003) [Biggs]; Irons v. Warden of California State Prison-Solano, 358 F.2d 936,947 (E.D. Ca. 2005); Hudson v. Kane, __ F.2d __, 2005 WL 2035590, WL p.9 (N.D. Ca.2005).

4. The Fifth and Fourteenth Amendments prohibit the government from depriving an inmate of life, liberty, or property without due process of law. It is now setteled that California's

1  parole schem, codified in California Penal Code section 3041,

2  vests all "prisoners whose sentences provide for the possibility

3  of parole with a constitutionally protected liberty interest in

4  the receit of a parole release date, a liberty interest is pro-

5  tected by the procedural safeguards of the Due Process Clause."

6  Irons v. Carey 479 F.3d 658,662 (9th Cir. 2007) citing Sass v.

7  Calif. Bd. of Prison Terms, 461 F.3d 1123,1128 (9th Cir.2006);

8  Biggs v. Terhune, 334 F.3d 910,914 (9th Cir. 2003); McQuillion

9  v. Duncan, 306 F.3d 895,903 (9th Cir. 2002)). Due process accor-

10  dingly requires that a parole board premise its decision on

11  "some evidence in the record" such that it is not arbitrary.

12  Sass, 461 F.3d at 1128-29 (quoting Superintendent v. Hill, 472

13  U.S. 445,457 (1085)). The "some evidence" standard is clearly

14  established federal law in the parole contex for purpose of §2254

15  (d). Id. at 1129.

16      5.  The Supreme Court set forth the "some evidence" stan-

17  dard in Superintendent v. Hill, which concerned the revocation

18  of "good time" credits towards parole based on inmate misconduct.

19  472 U.S. at 455. The Court rested its holding upon the foundation

20  laid in Wolff v. McDonnell, 418 U.S. 539, 536-67 (1974). As the

21  Court noted. Wolff required among other things, that an inmate

22  receive "a written statement by the fact finder of evidence re-

23  lied on and the reasons" for the deprivation of his good time

24  credits. Hill, 472 U.S. at 454 citing Wolff, 418 U.S. The Court

25  then added to Wolff: "[R]evocation of good time does not comport

26  with 'the minimum requirements of procedural due process,' unless

27  the findings of the prison disciplinary board are supported by

28  some evidence in the record." Hill, 472 U.S. at 455 (quoting
   Wolff, 418 U.S. at558.

## MEMORANDUM OF POINTS AND AUTHORITIES

THE DECISION TO FIND PETITIONER UNSUITABLE FOR A
PAROLE DATE IS AN ABUSE OF DISCRETION AND VIOLATES
DUE PROCESS WHEN IT CANNOT BE SUPPORTED BY ANY EVID-
ENCE IN THE RECORD SHOWING HIM TO BE A CURRENT TH-
REAT TO PUBLIC SAFETY, AND THEREFORE THERE IS NO
LEGAL BASIS TO DENY PAROLE.

California inmates appearing before the BPH have a liberty
interest protected by the United States Constitution. In re Rose-
nkrantz, 29 Cal. 4th 616,654,658 (2002): McQuillion v. Duncan,
306 F.ed. 895, 902 (2002); In re Dannenberg, 34 Cal. 4th 1061,
1084 (2005).

The touchstone of due process is the protection of the in-
dividual against arbitrary government action. Dent v. West Virgin-
ia, 129 U.S. 114, 123 (1989); Wolff v McDonnel, 418 U.S. 539,558
(1974);Daniels v Williams, 474 U.S. 327, 331 (1986).

BPH Decision which lacks evidence to support them are arb-
itrary, and thereby violative of the due process Clauses of both
the California and Federal Constitutions. See California Constit-
ution, Article I, §7; U.S. Constitution, Amendment 14. Also see
In re Powell, 45 Cal 3d. 894,904 (1988); In re Rosenkrantz, supra
at 654-658; McQuillion v Duncan, supra at 903-906.

The standard to be applied when reviewing BPH actions is
the "some evidence" test set forth in Superintendent v Hill, 472
U.S. 445, 456-457 (1985); In re Powell, supra at 902-904; In re
Rosenkrantz, supra at 423; In re Dannenberg, supra at 1084.

There must be some link, or nexus, between the facts relied
upon by the 2006 Panel to deny parole, and the underlying decis-
ion they reached: That petitioner would pose "an unreasonable
risk of danger to society if released from prison."

In parole cases, courts have been critical of decisions which used the facts of an offense to deny parole, but failed to establish some nexus between the offense factors and current dangerousness. McQuillion v Duncan, supra at 905,910,912; Dunn v U.S. Parole Comm., 818 F.2d. 742,745 (10th Cir., 1987); Quaglito v Sullivan, 719 F.Supp. 860,864 (D.Minn., 1989). California Courts have made it very clear that facts relied upon to deny parole must have a nexus to public safety. In re Caswell, 92 Cal. App. 4th 1017, 1029 (2001); In re Smith, 109 Cal. App. 4th 489, 505 (2003); In re Dannenberg 156 Cal. App. 4th 1399.

The BPH decision suffers from two fatal flaws. First, there is no record evidence supporting crime based parole denial at this time, some 23 years after the offense. Second, and much more importantly, there is no record evidence that any of the bases for parole denial implicate a public safety concern today. Phrased another way, there is no nexus between the stated reasons for parole denial and public safety.

The BPH in this case focused on the manner in which the crime was committed and denied parole almost entirely on that basis. As will be demonstrated in more detail infra, there is no basis for parole denial that can withstand even the most minimal scrutiny.

California's parole statute (Penal Code 3041) presumes that each inmate is suitable for parole after service of the minimum term. It sets forth in mandatory language that as the minimum term approaches, the inmate "shall" appear before the parole board, and that "a parole release date shall normally be set" at the very first parole hearing. There is but one exception to

the general rule: The safety of the public. With this undisputed
truth in mind, the court is asked to closely examine the record
(exhibit 4. pp. 3-8) in this case.

Only crimes that are extreamly cruel or callous rise to
the level required for parole denial. Parole suitability rules
cannot operate in a manner that makes every inmate unsuitable
for parole (In re Scott 119 Cal. App. 4th 894).

Thus, "the inquiry is whether among murders the one comm-
itted by [Core] was particularly heinous, atrocious or cruel."
(In re Lee 143 Cal. App. 4th 1409);(In re Cooper (2007) 153 Cal.
App. 4th 1063).

Upon close examination, the Board's bald assertions do not
support a conclusion that Stephen M. Core "... Will pose an un-
reasonable risk of danger to society if released from prison."
On the contrary, the Board's decision demonstrates a calculated
unwillingness to distinguish between the acts of Mr. Core and his
co-defendant (Andrew Avila) 1/ or to individually assess Mr.
Core's actual culpability. The Board's decision fails to afford
Mr. Core an individualized consideration of all relevant factors,
and thereby deprived him of due process of law .

a.) THE FACTUAL EVIDENCE DOES NOT SUPPORT THE BOARD'S
STATED REASONS FOR DENYING PAROLE.

The record reveals that Mr. Core was the youngest of all
the defendants (18 years) at the time of the offense and that he
was responsible for the homicide/robbery. Mr. Core's involvement

1/ Page 8 of exhibit states Andrew Avila is presently pending
trial, charged with First Degree Murder. The District Attorney's
Office indicates an intention to seek the death penalty for
Avila.

1  consisted of the following: **Petitioner Stephen Core and his bro-**
2  **ther Neil Core acted as the two lookouts while a third individ-**
3  **ule (Andrew Avila) committed the homicide/robbery.** (Exhibit 4.
4  at p. 4). Afterwards, money from the robbery was divided up 3
5  ways. Petitioner was responsible for dispossing of the items
6  used in the crime. The items included, the victim's wallet and
7  the shotgun used in the crime, pantyhose that were used to con-
8  ceal the identities of all the defendants. (exhibit 4. p. 6).

9  　　　b.) THERE IS NOT "SOME EVIDENCE" THAT CORE COMMITTED
10  　　　HIS OFFENSE IN A MANNER SHOWING HE IS UNSUITABLE
11  　　　FOR RELEASE.

12  　　The Board finding petitioner unsuitable for release in
13  part because this offense was carried out in an especially cruel
14  and callous manner. Additionally, it was carried out in a very
15  dispassionate and calculated manner demonstrating an especially
16  callous disregard for human suffering.

17  　　The principal fault of the Board's analysis is that the
18  panel failed to to properly distinguish between petitioner's
19  involvement and that of his co-defendant's.

20  　　The California Supreme Court in In re Rosenkrantz, supra,
21  made quite clear that it is only the nature of the prisoner's
22  offense. not that of any other person, which can justify denial
23  of parole. The court stated:

24  　　　　"The nature of the prisoner's offense, alone, can con-
25  　　　　stitute a sufficient basis for denying parole. (Citat-
26  　　　　ions omitted.) Although the parole authority is prohib-
26  　　　　ited from adopting a blanket rule that automatically
27  　　　　excludes parole for individuals who have been convicted
27  　　　　of a particular type of offense, the authority properly
28  　　　　may weigh heavily the degree of violence used and the
28  　　　　amount of viciousness shown by a defendant. (Citation

omitted.) * * * ¶ In some circumstances, a denial of
parole based upon the nature of the offense alone might
raise to the level of due process violation--for example
**Where no circumstances of the offense reasonably could
be considered more aggravated or violent than the min-
imum necessarry to sustain a conviction for that offense.**
Denial of parole under these circumstances would be in-
consistent with the statutory requirement that a parole
date date normally shall be set in 'a manner that will
provide uniform terms for offenses of similar gravity
and magnitude in respect to their threat to public ...'
(Pen. Code, §3041, subd. (a).)' The Board's authority
to make an exception [to the requirement of setting a
parole date] based on the gravity of a life term inmate's
current or past offenses should not operate so as to
swallow the rule that parole is normally to be granted.
Otherwise, the Board's case-by-case ruling would destroy
the proportionality contemplated by Penal Code section
3041, subdivision (a), and also by the murder statutes,
which provide distinct terms of life without possibility
of parole, 25 years to life, and 15 years to life for
various degrees and kinds of murder. (Pen. Code, §190
et seq.). **Therefore, a life term offense or any other
offenses underlying an indeterminate sentence must be
particularly egregious to justify the denial of a parole
date.**

In a recent case the Second Appellate District, the court
affirmed the Superior Court's order granting petitioner's petit-
ion for writ of habeas corpus. The court held that the only rat-
ional conclusion was that the prisoner posed little or no threat
to public safety, given that he was not the shooter, he had no
violent criminal history, he had an exemplary prison record, and
prison psychologists were in almost unanimous agreement that he
posed low risk for violence. Continuing to treat an accomplice
the same as the perpetrator of a crime in making a parole suit-
ility determination violates the prisoner's due process right
under Cal. Const., art. I, §7, to an individualized considerat-
ion of all relevant factors provided by Pen. Code, § 3041, and
Cal. Code Regs., § 2402. In determining whether the prisoner po-
sed a current public safety risk, it was certainly relevant that

17.

1  he refused a request to shoot the victim and did not pull the
2  trigger, but instead waited in the car for an accomplice to do
3  the shooting (In re Montgomery 156 Cal. App. 4th 930). Here, the
4  Board in Core's case viewed the nature of the crime without con-
5  sidering that Core was not the shooter. While an accomplice is
6  treated the same as the perpetrator of a crime for the purpose
7  of determining guilt and imposing sentence (e.g., People v. Pre-
8  ttyman (1996) 14 Cal. 4th 248, 259 [58 Cal. Rptr. 2d 827, 926 P.
9  2d 1013]), continuing to do so making a parole suitability deter-
10 mination violates the prisoner's due process right to "an indiv-
11 idualized consideration of all relevant factors." In re Montgom-
12 ery supra, at 946-947.

13     The evidence to support a parole denial cannot be any evid-
14 ence. It must be relevant to the issue of parole. Only evidence
15 bearing on the likelihood of recidivism and only to the extent it
16 reveals an 'unreasonable risk' of danger to the public safety is
17 relevant to this decision. (In re Lawrence (2007) 150 Cal. App.
18 4th 1511, 1543. 2/.

19     While the commitment crime is a factor to be considered in
20 the Board's decision, " ... the commitment crime can lack the po-
21 wer to supply "some evidence" supporting a denial of parole be-
22 cause of the interplay between two factors--the nature of the cr-
23 ime and the passage of time since its commission." (In re Lawrence,
24 supra, at 1540.) Thus, a commitment offense only negates suitab-
25 ility for parole "if circumstances of the crime reliably establish
26 by evidence in the record rationally indicate that  the offender

27 2/. It should be noted that, unlike the Petitioner and other
   defendants in the other cited cases who were convicted of second-
28 degree murder, Lawrence was convicted of first-degree murder.

1  will present an unreasonable public safety risk if released from
2  prison." (In re Elkins (2006) 144 Cal. App. 4th 475, 496.) However
3  '''the predictive value of the commitment offense may be very qu-
4  estionable after a long period of time. [Citation.] Thus, denial
5  of release solely on the basis of the gravity of the commitment
6  offense warrants especially close scrutiny.''' (In re Elkins, su-
7  pra, 144 Cal. App. 4th at 496 (quoting In re Scott (2005) 133 Cal.
8  App. 4th 573, 594-595.) The fact that there is "some evidence" the
9  crime was committed in certain way, at certain time does not nec-
10 essarily establish "some evidence" that the petitioner's release
11 on parole will pose a present unreasonable risk to public safety.
12 (In re Lawrence, supra, at 1540.) "After 23 years of rehabilitati-
13 on and no prior history of violence, the ability to predict a
14 prisoner's future dangerousness based simply on the circumstances
15 of his crime is nil." (In re Lawrence, supra, at 1552 (quoting
16 Rosenkrantz v. Marshall, 444 F. Supp 2d 1063).) To determine whet-
17 her the commitment crime posses the necessary predictive value,
18 one must examine both the nature of the crime and how long ago it
19 happened. (In re Lawrence, supra, at 1540.)

20          c.) A CALIFORNIA PRISONER WITH A SENTENCE OF A TERM OF
21              YEARS TO LIFE WITH THE POSSIBILITY OF PAROLE HAS A
                PROTECTED LIBERTY INTEREST IN RELEASE ON PAROLE AND
22              THEREFORE A RIGHT TO DUE PROCESS IN THE PAROLE SUIT-
                ABILITY PROCEEDINGS.
23

24          The facts of the crime will be just as terrible 20 years
25 from today as they are today and as they were 23 years ago. Not-
26 withstanding the terrible nature of the crime, the critical quest-
27 ion the BPH was supposed to decide at the parole suitability hear-
28 ing was whether "consideration of public safety requires a more

19.

lengthy period of incarceration for this individual." See Cal. Penal Code § 3041 (b). When the totality of circumstances are considered, Cores' 1985 crime did not provide sufficient evidence to find him unsuitable for parole in 2006. Cores' case is the kind of case Biggs and Irons cautioned about: the continued reliance on the immutable events of the crime to deny parole for present dangerousness despite the candidates exemplary behavior in prison, favorable current psychological reports, and the absence of any other violence or criminal record.

On January 8, 2008, the Court of Appeals for the Ninth Circuit decided Hayward v. Marshall, 512 F.3d 536 (9th Cir. 2008), a case in which the Governor of California twice reversed the BPH's determination that an inmate was suitable for parole.

The petitioner in Hayward, like the petitioner in this case challenged the evidence used to justify his parole denial.

'''A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty interest, and (2) a denial of adequate procedural protections.''' See McQuillion v. Duncan, 306 F.3d 895, 900 (9th Cir. 2002) (quoting Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist., 149 F3d 971, 982 (9th Cir. 1988)).

Under the compulsion of binding Ninth Circuit precedent, the court concluded that (1) "California prisoners have a liberty interest in parole," and (2) "a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by some evidence in the record, or otherwise arbitrary." Hayward, 512 F.3d at 542 (internal quotation marks and citations omitted). Next the court turn to the

1   question of whether the procedural protections afforded petiti-
2   oner were adequate. '''When we assess whether a state parole bo-
3   ard's suitability determination was supported by 'some evidence'
4   in a habeas case, our analysis is framed by the statutes and re-
5   gulations governing parole suitability determinations in the re-
6   levant state.''' Hayward, 512 F.3d at 542 (quoting Irons, 505 F.
7   3d at 851). We must look to California law '''to determine the
8   findings that are necessary to deem a prisoner unsuitable for
9   parole.''' Id. (quoting Irons, 505 F.3d at 851). Next, we '''must
10  review the record in order to determine whether the state court
11  decision holding that these findings were supported by 'some ev-
12  idence' ...constituted an unreasonable application of the 'some
13  evidence' principle.''' Id. (quoting Irons, 505 F.3d at 851).

14      Under that rubric, the "findings that are necessary to de-
15  em a prisoner unsuitable for parole ... are not that a particular
16  factor or factors indicating unsuitability exist, but that a
17  prisoner's release will unreasonable endanger public safety."Id.
18  at 543 (internal quotation marks and citations omitted) (emphasis
19  added). In fact, '''[s]ome evidence of the existence of a parti-
20  cular factor does not necessarily equate to some evidence the pa-
21  rolee's release unreasonably endangers public safety.''' Id.
22  (citation omitted).

23      The BPH's decision to deny petitioner's parole was based
24  on several factors. First, the BPH found that the offense "was
25  carried out in an especially cruel and callous manner." Next,
26  the BPH concluded that the offense was carried out in a very di-
27  spassionate and calculated manner. Also, the BPH deemed that the
28  offense was carried out "in a manner that demonstrated a total

1  disregard for human suffering."

2      In Hayward, the Ninth Circuit held that "[t]th Governor
3  violated Hayward's due process rights by relying on the unch-
4  anging factor of motive for the commitment offense in revers-
5
6  ing parole." 512 F.3d at 547. The Court emphasized that "the
7  unchanging factor of the gravity of Hayward's commitment off-
8  ense had no predictive value regarding his suitability for
9  parole." Id. at 546. Here, the BPH's reliance on unchanging
10  factors is similarly insufficient to justify parole denial.
11  See id. at 545 (rejecting the Governor's reliance on unchang-
12  ing factors as "some evidence" that a prisoner is unsuitable
13  for parole).

14      In Hayward's case, a jury convicted him of second degr-
15  ee murder after he stabbed a man twelve times. 512 F.3d at 539.
16  In reversing Hayward's parole, the Governor specifically noted
17  Hayward's history of juvenile mischief and asserted that he
18  was first placed on probation at age eight. The Courts respon-
19  se:Haywars's juvenile conduct, which occurred nearly fifty
20  years ago, provides no basis for a conclusion that he currently
21  poses any threat to public safety. Though Hayward was arrested
22  many times before he committed the murder in this case, these
23  arrest ocurred thirty or more years ago and also do not supp-
24  ort a conclusion that Hayward currently poses any thraet to
25  public safety. (Id. at 545-546).

26      In the case of petitioner, he was not the shooter--in
27  his case (In re Montgomery 156 Cal. App. 4th 930). He was
28  however an accomplice. Besides the instant offense, he has no

1  prior history of conduct disorder or violent behavior. Therefore,

2  petitioner strongly contends that the Board's reliance upon the

3  circumstances of his crime have now violated due process. While

4  it may have been reasonable to rely upon the circumstances of his

5  crime as an indicator of dangerousness for some period of time,

6  continued reliance on such unchanging circumstances after --23

7  years, of incarceration violates due process because these fact-

8  ors lack predictive value with regard to petitioner's past and

9  future dangerousness (In re Singler 2008 DJDAR 4201); (In re Da-

10 nnenberg 156 Cal. App. 1400-1401); (In re Lee 143 Cal. App. 4th

11 1412); (In re Elkins 144 Cal. App. 4th 496).

12     In sum, the board had a personal (not evidentiary) disagr-

13 eement with its own expert witness conclusions. This is not a

14 valid basis to disgard the uncontradicted evidence before the

15 panel.

16     There is simply no record evidence that petitioner's crime

17 meets the criteria for crime based unsuitability. Further there

18 is no evidence any of the crime based reasons for parole denial

19 cited by BPH have a nexus to public safety if petitioner were re-

20 leased today. Without such a nexus the crime cannot be used to

21 deny parole. The BPH decision in this regard cannot stand.

22                              CONCLUSION

23

24     For the foregoing reasons, petitioner prays the relief re-

25 quested herein will be granted.

26

27

28

## PRAYER FOR RELIEF

Petitioner respectfully request the following relief:

1) That the Court issue an Order To Show Cause;

2) Conduct an Evidentiary Hearing;

3) Order Respondents to provide Petitioner with Reasonable discovery;

4) Appoint Counsel to Represent Petitioner in any and all proceedings in this matter.

5) Declare the rights of the petitioner;

6) Grant any other further relief the Court deems proper and just.

Date: 6/30/08

Respectfully submitted,

Stephen M. Core

24.

<u>DECLARATION OF SERVICE BY MAIL</u>

(28 U.S.C. section 1746)

I, Stephen M. Core _____, declare: That I am a resident of the Correctional Training Facility in Soledad, California; I am over the age of eighteen (18) years; I am / am not a party to the attached action; My address is P.O. Box 689, _____, CTF - Central Facility ,Soledad, CA 93960-0689 I served the attached document entitled: PETITION FOR REVIEW

on the persons/parties specified below by placing a true copy of said document into a sealed envelope with the appropriate postage affixed thereto and surrendering said envelope(s) to the staff of the Correctional Training Facility entrusted with the logging and mailing of inmate legal mail addressed as follows:

OFFICE OF ATTORNEY GENERAL
455 GOLDEN GATE AVENUE, SUITE 11000
SAN FRANCISCO, CA 94102

There is First Class mail delivery service by the United States Post Office between the place of mailing and the addresses indicated above. I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct, and I executed this service this 30 day of June , 2008 , at the Correctional Training Facility in Soledad, CA.

Stephen Core
Declarant

25.

# EXHIBIT 1

# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF KERN

**JUDGES**

Gary T. Friedman
Clarence Westra, Jr.
James M. Stuart
Roger D. Randall
Arthur E. Wallace
Richard J. Oberholzer
John I. Kelly
Kenneth C.
Twisselman II
Robert Anspach
Stephen P. Gildner
Jerold L. Turner
Sidney P. Chapin
Lee P. Felice
Jon E. Stuebbe
Coleen W. Ryan
John L. Fielder
Sharon Mettler
Frank A. Hoover
Charles P. McNutt
H. A. "Skip" Staley
Charles B. Pfister
Michael B. Lewis
Michael G. Bush
Colette M. Humphrey

**COURT COMMISSIONERS**

James L. Compton
Theresa A. Goldner
Ralph L. McKnight, Jr.
Louie L. Vega
Patrick M. Alderete

☒  1415 Truxtun Avenue, Rm. 212
Bakersfield, CA 93301-5222
(661) 868-4934

☐  1215 Truxtun Avenue
Bakersfield, CA 93301-4619
(661) 868-2450

**SENIOR JUVENILE COURT REFEREE**

Peter A. Warmerdam

**COURT EXECUTIVE OFFICER  CLERK OF THE COURT**

Terry McNally

**January 31, 2007**

**STEPHEN M. CORE, CDC # D-19109**
**CORRECTIONAL TRAINING FACILITY**
**P.O. BOX 705**
**SOLEDAD, CA  93960-0705**

Dear Sir:

A Petition of Habeas Corpus has been filed with this court.   A conformed copy (front page) is enclosed with the date of filing and case number.  Your case has been assigned to:  Judge. JOHN I KELLY

Your case number is as follows:  **HC009737A**

If you need to contact this court please refer to the case number above.

TERRY MCNALLY, COURT EXECUTIVE OFFICER
SUPERIOR COURT COUNTY OF KERN

cc:  file

In re: Stephen M. Core on habeas corpus
KCSC# HC009737A  CDC#D-19109

## ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

The court has read and considered the petition for writ of habeas corpus filed bon January 31, 2007. Petitioner is serving fifteen years to life sentence for second degree murder the firearm enhancement was stayed. Petitioner pled guilty. He is serving this sentence the Correctional Training Facility in Soledad California.

Petitioner is not protesting his conviction or sentence. He contends that the Board of Hearings and Paroles keep finding him unsuitable for parole; the latest finding of unsuitability was in an August 29, 2006 hearing. Petitioner contends that the commission relied on boiler plate reasons such as the callousness of the previous crime and conclusory allegations that he is unsuitable for parole. Petitioner contends that pursuant to the ninth Circuit Court of Appeals holding in Biggs v. Terhune, 334 F.3d 910, he has a liberty interest to be granted parole. Petitioner alleges that there is no evidence to deny him parole, and thus his continued incarceration violates not only the U.S. Constitution but also the court cases which require that some evidence exist to continue his incarceration.

The petitioner points to many factors showing his suitability for parole: a. His relative stable social history; b. His being discipline free since 2003; c. His assistance of the police upon his arrest for the murder; d. His skills in carpentry and landscaping; e. The probation report offering several mitigating factors such as his youth and that he was less culpable in the murder than the two other confederates (the Avila brothers); f. The psychologist's opinion that petitioner pose no more than average danger to society upon his release;

The Board of Hearings and Paroles found that notwithstanding petitioner's many accomplishments, petitioner's employment goals and his location were nebulous and not firm. For Example, he had no employment upon release. Further, the Board of Hearings and Paroles opined that it would not be a good idea for him to resettle in Boron, a place where the crime was committed. Petitioner had to further develop his vocational and residential plans as well as ensure his enrollment in a narcotics anonymous class upon parole.

Here the Board of Hearings and Paroles did not solely rely on the callousness of the crime to determine whether petitioner remains a threat to public safety. The Board relied on other factors to determine his unsuitability for parole for a limited one year period.

Petitioner's liberty interest must be balanced against the need to ensure public safety. So long as there is some evidence to support the Board's decision, the court will

uphold its determination. Biggs v. Terhune (2003), 334 F.3d 910, 916-917, In re: Rosenkrantz, (2002)], 29 Cal.4th 616, 676. The evidence must indicate that petitioner remains a threat to public safety. In re: Lee (2006) 143, Cal. App. 4th 1400, 1408. This case shows concrete steps the petitioner must undertake before being found suitable for parole, and his hearing will be in one year. The key here is that petitioner must firm up his residential and employment plans, and remain discipline free.

If petitioner is denied parole again in one year, petitioner is certainly free to file a petition for writ of habeas corpus, and the court will consider that petition as well.

Based upon the foregoing, the petition for writ of habeas corpus is accordingly denied.

Dated:  3-23-07

Judge of Superior Court

EXHIBIT 2

IN THE

# Court of Appeal of the State of California

### IN AND FOR THE

## Fifth Appellate District

COURT OF APPEAL
FIFTH APPELLATE DISTRICT
F I L E D

NOV 2 9 2007

LEISA V. BIGGERS, CLERK/ADMINISTRATOR
By_____
Deputy

In re
STEPHEN M. CORE,

    On Habeas Corpus.

F052946
(Kern County Sup. Ct. No. KER29898)

BY THE COURT:*

    The petition for writ of habeas corpus filed in this court on May 29, 2007, is denied.

_____ Acting Presiding Justice

*Before Harris, Acting P.J., Wiseman, J. and Gomes, J.

EXHIBIT 3

S159240

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re STEPHEN M. CORE on Habeas Corpus

---

The petition for writ of habeas corpus is denied. (See *People v. Duvall* (1995) 9 Cal.4th 464, 474.)

SUPREME COURT
FILED

JUN 1 1 2008

Frederick K. Ohlrich Clerk

_____
Deputy

GEORGE
_____
Chief Justice

# EXHIBIT 4

1  FILE#      02-77-42
   SET FOR:   November 19, 1985
2  COURT:     Dept. 3
   ATTORNEY:  Gregory Mitts
3  DPO:       JLS

4

5

6

7

8

9

10              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                  IN AND FOR THE COUNTY OF KERN

12              *   *   *   *   *   *   *   *   *   *

13   THE PEOPLE OF THE STATE OF CALIFORNIA   *

14                           PLAINTIFF,   *   PROBATION OFFICER'S

15   STEVEN MICHAEL CORE                   *        REPORT

16                           DEFENDANT.   *      NO.  29898

17   *   *   *   *   *   *   *   *   *   *   *   *   *   *

18              HONORABLE JAMES G. BOWLES, JUDGE

19   DOB: July 2, 1967              CITIZENSHIP: U.S.

20   BIRTHPLACE: Ridgecrest, CA     MARITAL STATUS: Single

21   SEX: Male                      DEPENDENTS: None

22   ETHNIC GROUP: White            MILITARY STATUS: None

23   DRIV. LIC. # C4001585

24   SOC. SEC. # 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

25   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

26

**PRESENT CHARGE:**

        The defendant is before the Court at this time; having originally been charged with Two Felonies, to-wit: Count One, Violation of Section 187 of the Penal Code, and Count Two, Violation of Section 211 of the Penal Code, with the further allegation as to each count that a principle was armed with a firearm within the meaning of Section 12022(a) of the Penal Code.  The defendant was arraigned on August 28, 1985, and pled not guilty; at which time, a trial date was set.  On October 4, 1985, the defendant entered a change of plea and pled guilty to a Felony, to-wit:  Count One, Violation of Section 187 of the Penal Code, Second Degree, and admitted to the further allegation pursuant to Section 12022(a) of the Penal Code.  The defendant was advised of the maximum term of sentencing and that the armed clause was to be stayed.  Upon motion of the Deputy District Attorney, Count Two was dismissed.  The matter was referred to the Adult Probation Department under Section 1203 of the Penal Code for investigation, report, and recommendation; said report to be considered for sentencing on November 19, 1985.

        The defendant was arrested on July 6, 1985, in Boron, California, by the Kern County Sheriff's Office.  He was released on bail on August 14, 1985; this constituting 40 days in custody, added to which will be 20 days good and work time, for a total of 60 days credit for time served.

***

**PRIOR RECORD:**

The defendant has no prior criminal record as a juvenile or as an adult.

**CIRCUMSTANCES OF THE PRESENT OFFENSE:**

This case concerns the death, on July 3, 1985, of Mr. Chun Kang, age 50.

On July 3, 1985, at approximately 4:00 a.m., a customer entered the Rocket Site Mini Mart in Boron, California. When the person on duty did not respond to the cash register to accept the customer's money, he went into the store's office and observed Mr. Kang lying on the floor in a pool of blood. At that point, the customer contacted the Kern County Sheriff's Office by telephone.

A short time later, when a Sheriff's officer arrived on the scene, he noted that the victim was lying on his side in the store office with what appeared to be a gunshot wound on his left cheek. A criminalist who arrived on the scene, after examining the body and the blood pattern, stated that it appeared that the victim had been lying facedown on the floor when he was shot and then possibly shoved into a corner, being partially rolled over. It was noted that the weapon used was possibly a sawed-off shotgun.

A daughter of the victim, who arrived on the scene, advised officers that her father always carried a wallet containing numerous credit cards and identification cards. The wallet was noted to be missing. When officers searched the

area outside of the store, they found an identification card
with the victim's picture on it.  At that point, officers began
an investigation with no initial suspects.

By July 7, 1985, officers had received telephone
calls from several different individuals, stating that Andrew
Avila, age 20; Neil Core, age 19; and Steven Core, age 18 were
responsible for the homicide/robbery.  Officers were told that
Andrew Avila was reportedly bragging about the shooting.
Another individual informed officers that when the Core
brothers had been intoxicated, they had told about how they and
another individual had been involved in the robbery/shooting.
They had reportedly stated that they acted as lookouts while
the other individual committed the robbery.

On July 5, 1985, it was decided that the Core
brothers and Andrew Avila should be located and taken into
custody for questioning.

On the evening of July 5, 1985, officers located
Steven Core and Neil Core at their residence in Boron,
California, and took them into custody.  Both Steven and Neil
Core consented to talk with the officers and to have the
interview tape-recorded.  The undersigned officer has listened
to the taped interviews of Steven and Neil Core.

At first, Neil Core denied any knowledge of the
robbery/murder; however, by the conclusion of the interviews,
both Core brothers had stated substantially the following:

The robbery/murder was actually committed by Andrew

1  Avila; however, both Core brothers were involved and were in

2  the area when the robbery/murder took place.

3        Andrew Avila had previously expressed a desire to

4  commit the robbery and had expressed a desire to "blow away"

5  the clerk. On the evening before the crime took place, all

6  three subjects had been at the residence of Neil and Steven

7  Core. Neil Core had a motorcycle for sale, which Andrew Avila

8  wanted to purchase, but could not because he didn't have any

9  money. Partly for that reason, but not for that reason alone,

10  Avila decided to go ahead with the robbery. Avila obtained a

11  20-gauge sawed-off shotgun belonging to Neil Core, which was in

12  the residence. Avila advised the Core brothers that he was

13  going to commit the robbery with or without them.

14        Both brothers maintained that they pleaded with Avila

15  not to commit the robbery; however, they both subsequently

16  accompanied Avila when he walked to the store to commit the

17  robbery. Neil Core had a sawed-off .22 rifle in his possession

18  at that time. Avila entered the store alone with the sawed-off

19  shotgun. A few minutes later, the sound of a shotgun blast was

20  heard and shortly after that, Avila ran from the store. Upon

21  leaving the store, Avila reportedly stated, "I knocked him

22  off."

23        Avila reportedly stated to them that while the victim

24  was on the ground, he looked up at Avila, and Avila thought

25  that he had seen Avila's tattoos. Avila reportedly stated that

26  due to that fact, he shot the victim in the face with the

shotgun.

    After the robbery, Avila and the Core brothers returned to the Cores' residence. Upon arriving at the residence, Avila reportedly split the money taken in the robbery three-ways, also giving Neil Core $100.00 for the motorcycle. He gave Steven Core the victim's wallet, to dispose of. Steven Core stated that he put the wallet in a hole in the wall in his house. Avila also reportedly gave the Core brothers the pantyhose, which he had been wearing over his face, to be disposed of, as well as the shotgun. He then changed clothes and left.

    During the interviews, Steven and Neil Core signed a consent-to-search form for their residence. Upon completing the interviews, the officers went to their residence for the purpose of searching it. In a hole in a wall, officers located the victim's wallet as the Cores had described. From the attic, officers seized a 20-gauge sawed-off shotgun and a .22 caliber sawed-off rifle, along with numerous rounds of .22 caliber and 20-gauge shotgun amunition. In a subsequent interview, Neil Core described to officers how Avila had cut the legs off a pair of pantyhose, put the pantyhose over his head, then cut out eye-holes. Neil Core stated he had also had pantyhose over his head.

    Also on the evening of July 5, 1985, officers located and arrested Andrew Avila. Avila refused to discuss the crime with officers and the interview was terminated. It is noted

that from the time immediately after the robbery/murder until approximately July 18, 1985, during the investigation of the crime, officers talked to numerous people in the Boron area and obtained various bits of information from them.

Troy Romero advised officers that approximately one year prior, he had traded Neil Core a sawed-off shotgun and a .22 caliber rifle.

Another individual stated that he had heard from friends, before the crime, that Avila and the Core brothers planned to rob the store, and that afterwards, they had talked about it. This individual stated that the Core brothers used "crank" heavily and on July 4, 1985, had tried to buy "crank" from him.

Numerous people advised officers that they had heard Avila brag about committing the robbery and shooting the victim, and also stated that the Core brothers had been involved.

Another individual stated that before the robbery, he had heard Neil Core state that they should "rip off" the market. The same individual stated that Avila had told him later that he had committed the murder and also threatened to kill the individual if he told anyone.

Another individual advised officers that before the crime occurred, Neil Core had stated that Avila was going to "blow someone away." The same individual told officers that on the morning after the crime, Neil Core stated that Avila had

1  committed the murder.  Several individuals reported to officers

2  that Avila had stated that he shot the victim when he thought

3  the victim had seen his tattoos.

4          An autopsy performed on the victim's body revealed

5  that the cause of death was "asphyxia, due to upper respiratory

6  obstruction by blood, due to a penetrating shotgun wound to the

7  cheek."

8          Andrew Avila is presently pending trial in Kern

9  County Superior Court, charged with First Degree Murder.  The

10 District Attorney"s Office indicates an intention to seek the

11 death penalty for Avila.

12         The defendant's brother Neil Core is also pending

13 sentencing for Second Degree Murder.

14 **DEFENDANT'S STATEMENT:**

15         The defendant did not submit a written statement;

16 however, he discussed the crime at length with this officer.

17 The defendant's statement regarding the crime agreed

18 substantially with the information contained above.

19         The defendant stated that Avila was a friend who had

20 stayed at their residence off-and-on due to the fact that he

21 had nowhere else to stay.  He stated that Avila had stated

22 numerous times that he was going to commit the crime; however,

23 he and his brother did not believe him at first.

24         He stated that when Avila obtained the gun and left

25 to commit the crime, he and his brother went with him and

26 remained outside the store.

Page 8

He stated that when Avila returned to his residence after the crime, Avila kept saying, "If you talk, I'll knock you off." The defendant stated that he and his brother did take some of the money from Avila and disposed of some of the items brought by Avila, including the victim's wallet and the shotgun. The defendant stated that the whole situation is a nightmare, in which he did not intend to get involved. He stated that he does bear some responsibility due to his actions, but does not feel he is guilty of murder.

The defendant stated he pled guilty due to the fact that he was persuaded that he would be convicted of first degree murder if he did not plead guilty.

**VICTIM INTERVIEW AND RESTITUTION INFORMATION:**

This officer talked to two members of the extended family of the victim. Communication with them was somewhat difficult due to the fact that they are Korean and there are language problems. Mr. William Kang, age 22, was able to communicate reasonably well with this officer. He was advised of the preparation of this pre-sentence report and of the purpose of our contact with him. He was advised that a letter would be sent to him, and if he or any member of the Kang family wished to respond, to please do so as soon as possible.

**PERSONAL AND FAMILY HISTORY:**

The defendant, Steven Core, is an 18-year-old Caucasian male, who resides with his parents at 24360 Chaparral Street, Boron, California. The defendant stands five feet,

nine inches tall, weighs 150 pounds, and has blue eyes and brown hair.

The defendant has never been married and has fathered no children.

The defendant's father, Carroll Core, is an electrician who works for a water district in that area. The defendant's mother, Anita Core nee Anhalt, works as a bus driver. They both reside at the aforementioned address. The defendant has a sister, age 20, and one brother, Neil, age 19, who is a co-defendant in this case.

The defendant submitted the following brief history of his life:

"Ive lived in Boron CA all my life."

**RELIGION AND EDUCATION:**

The defendant claimed affiliation with the Catholic Church. He denied involvement with any other organization.

The defendant stated that all of his schooling has been in the Boron area. He stated he attended Boron High School and North Edwards High School, which is a continuation school. He stated he quit school in the twelfth grade without graduating.

**MILITARY RECORD AND HEALTH:**

The defendant has never been a member of the United States Armed Forces.

The defendant stated he is in good health and does not suffer from any physical handicap.

The defendant denied any use of alcohol or illegal drugs.

**RESOURCES AND EMPLOYMENT:**

The defendant stated that he has held no jobs except a temporary part-time job helping his father work for a water district.

The defendant stated that he works only when needed on an hourly basis. He stated he sometimes makes as much as $100.00 per week, but does not normally make that much.

The defendant claimed no assets and no outstanding liabilities.

**EVALUATION:**

**Circumstances In Mitigation:**

Pursuant to the sentencing rules of the Uniform Determinate Sentencing Act, the following circumstances are being listed in mitigation.

(1). Although the defendant must be held accountable for his actions in this case, it is this officer's opinion that he was induced by Co-defendant Avila to participate in the crime which led to the victim's death.

(2). The defendant does not possess a known prior criminal record as a juvenile or adult.

(3). Although the defendant did not enter a guilty plea until the case reached Superior Court, it is this officer's opinion that it is a mitigating factor in this case, that the defendant admitted his involvement in the crime on the

day of his arrest and assisted police officers in their
investigation of the crime.

### Circumstances In Aggravation:

In this officer's opinion there are no aggravating
circumstances in this case.

### Analysis:

Appearing before the Court at this time is the
defendant, Steven Core, age 18, after having pled guilty to
Count One, Violation of Section 187 of the Penal Code, Second
Degree. The defendant reached his 18th birthday on the day
before the crime in this case.

It is this officer's opinion that this is an unusual
case and that while the defendant is not without culpability,
the ramifications of the case went far beyond what the
defendant intended them to be. The tragic consequences for the
victim and the victim's family are of prime importance and
cannot be ignored. It appears that the defendant was aware of,
or suspected, the possibility that the victim would be killed
in the robbery. It is fact that the defendant not only failed
to report the robbery/murder after it was committed, but
assisted Avila in attempting to cover up the crime.

It must be acknowledged, however, that immediately
upon his arrest, the defendant admitted fully his involvement
in the crime, and his admission greatly assisted officers in
their investigation of the case.

This officer has received several reference letters

on the defendant's behalf, which have been provided to the
Court.

In an effort to learn more about the defendant and
his brother.  This officer contacted sheriff's officers at the
Boron Substation.  It was learned from officers there that
through high school, the defendant and his brother were
considered to be normal, productive young people who
participated in high school sports and various activities.  The
officers stated that in recent months, the defendant and his
brother were suspected of being involved in drug use, primarily
"crank," and that they were known to "run" with a group of
people who used "crank"; however, the officers stated that the
defendant and his brother were not known to have actually been
involved in criminal activity up to the time of the crime in
this case.  Officers stated that they have cited both the
defendant and his brother for possession of less than an ounce
of marijuana, but have taken no other action against them in
the past.  The officers reiterated that they would not have
suspected the defendant and his brother to have become involved
in a murder.

Due to the plea which has been entered in this case,
to Second Degree Murder, it appears that there is no latitude
available as to sentencing.  While the defendant is not
eligible for commitment to the California Youth Authority, due
to the fact that he has been convicted of a serious Felony
within the meaning of Section 1192.7 of the Penal Code, he

would be eligible to be housed at the California Youth
Authority even though committed to prison.  It appears that
that would be a proper disposition in this case.

It is with the above thoughts in mind that the
following recommendation is respectfully submitted.

| PUNISHMENT | AGG. | MIT. | BASE TERM | ENHANCEMENT | C/S | SENTENCES | TOTAL |
|---|---|---|---|---|---|---|---|

Count One:  PC 187, 2nd Degree:

| 15-to-Life | No | Yes | 15-to-Life | PC 12022(a)<br>(stayed) | None | | 15-to-<br>Life |
|---|---|---|---|---|---|---|---|

**RECOMMENDATION:**

It is respectfully recommended that probation be
denied, and the defendant be sentenced to the Department of
Corrections for the term prescribed by law, but to be housed at
the California Youth Authority pursuant to Section 1731.5(c) of
the Welfare and Institutions Code.  Pursuant to the negotiated
plea in this case, it is recommended that punishment on Section
12022(a) of the Penal Code be stayed.

***

1         It is further recommended that the defendant pay a

2   restitution fine in the amount of $100.00, pursuant to

3   Government Code Section 13967.

4                           RESPECTFULLY SUBMITTED,

5                           T. GLEN BROWN
                        COUNTY PROBATION OFFICER

6   DATED: November  , 1985

7

8                           L. Savage
                        Deputy Probation Officer

9                           Adult Division

10      I HAVE READ AND CONSIDERED THE PROBATION OFFICER'S REPORT.

11  DATED: November  , 1985

12

13                          JUDGE OF THE SUPERIOR COURT
                        BAKERSFIELD, KERN COUNTY
                        CALIFORNIA

14

15  JLS:glc

16

17

18

19

20

21

22

23

24

25

26

EXHIBIT 5

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
NOVEMBER/DECEMBER LIFER DOCUMENTATION HEARING

## IDENTIFYING INFORMATION

The inmate, a 21-year-old white male, was seen for about 45 minutes on August 26, 1988 for the purpose of this evaluation which was explained to him. His central file and medical record were reviewed. This report is intended as a supplement to previously recorded information.

## PAST PSYCHIATRIC HISTORY

Significant past psychiatric history includes smoking marijuana and using speed, since age 16, about once a week until the arrest for the instant offense. The inmate stated that he was not good in school with book learning but did much better with his hands. This may have been the reason why he got more physical punishment from his father than his siblings did. He came from a religious family and was raised as a Catholic. He was an alter boy for seven years and accepted the moral teachings of the church. However, he was ignorant about the law that made him guilty, even as an inactive bystander some 100 yards away from the crime scene that his "friend" of four years committed. He denied any prior convictions of criminal activities although he was involved in drug use and "partying". He apparently has no significant disciplinary problems in prison. He denies a past history of any type of violence. There is no family history of alcoholism, mental illness, or criminality. Except for having seen a school psychologist in the sixth grade for testing, the inmate denies personal history of psychiatric conditions aside from adjustment to the situation he finds himself in now.

## MENTAL STATUS EXAMINATION

The inmate presents himself as a healthy looking young man with long hair and a mustache, fully alert, oriented, and coherent. He is sincere and troubled about his circumstances which he regards as the consequence of his passivity and ignorance of the law. He expresses regrets spontaneously about the death involved. When the "friend" expressed interest in buying his brother's motorcycle and talked about doing a robbery to get the money, the inmate thought to himself that this was crazy and he, the friend, was not really going to go through with it. If he could do this over again he would now definitely tell the "friend" not to do it and would stay away from him entirely and refuse to remain passive, instead he would inform the authorities. Although his educational and work programs have resulted in considerable new learning, and his institutional adjustment is entirely satisfactory, he says he feels very troubled about his circumstances in prison and sometimes crys when he has the opportunity, feeling sorry about what has happened. He added, "I never dreamed this would happen, I thought this is crazy, he isn't going to do it." The inmate, although generally unsophisticated has a full range of emotional responsiveness and shows no signs indicative of mental illness.

CORE, Stephen      D-19109      CMF-South      08-29-88      JL:dp   1 of 2

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS (CONTINUED)


DIAGNOSIS

AXIS I:      No diagnosis.
AXIS II:     No diagnosis.
AXIS III:    No diagnosis.

CONCLUSIONS AND RECOMMENDATIONS

Although the inmate gives a history of psychoactive drug use and abuse, avail-
able evidence is not sufficient to justify a formal diagnosis based on DSM III
R criteria.  The inmate is fully cognizant of the destructive aspects of drug
use and abuse aside from its' illegality, and agrees with the advise that all
psychoactive substance use should be avoided.  He presents as an unsophisticated
individual who was caught due to his naivete in circumstances which led to his
incarceration for the crime to which he plead guilty on basis of technicalities
rather than substantial participation in the crime.  His personality make-up
does not include deficient capacity for guilt and formation of conscience, nor
any inherently generated hostilities in search for expression through violent
behavior.  Neither the available record nor the inmate's personal presentation
points to evidence for thinking of him with any greater potential for violent
behavior or other types of criminality than the average citizen possesses.
Aside from these general comments and advise to refrain from psychoactive sub -
stances, there are no further psychiatrically indicated considerations in re-
gard to the question of parole readiness.


Juhan Liikane, M.D.
Staff Psychiatrist


Orig:  central file
  cc:  medical file, writer, CC II


CORE, Stephen          D-19109          CMF-South          08-29-88    JL:dp  2 of 2

**CALIFORNIA STATE PRISON - SOLANO**
Vacaville, California

**PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS**
JANUARY 1994 CALENDAR

The following is the Third Psychological Report to the Board
of Prison Terms on this 26 year old Caucasian male who is
currently serving a 15 Year to Life Term for **Murder Second.**

This examiner interviewed inmate Core on December 27, 1993,
for 40 minutes. His central file and medical records were
reviewed for an additional hour to ensure both accuracy and
completeness of this report. This examination was for the
preparation of this Board Report only.

BACKGROUND INFORMATION:

Inmate Core's family and personal history have been well-
documented in prior reports. In this interview he described
coming from a good Catholic family. He feels that he "really
messed up" and that drugs destroyed his whole life and that he
has learned his lesson. He describes himself as an addict.
His difficulties in school had a lot to do with not having
very many friends to talk to. He has since completed his high
school diploma. He never held a job prior to his
incarceration. He attributes the CDC 115s he has received for
job performance to not having held a job previously. "I'm not
violent, just stupid."

Mr. Core tends to idealize his mother "God couldn't have given
me a better one." He doesn't feel that he has social skills
however, he describes himself as shy and not confident with
women "women intimidate me." Upon exploration of this he said
that he was afraid of rejection. Currently he corresponds
with a couple of women. He hopes someday to get married and
own a home. His mother continues to visit him approximately
four time s a year.

Mr. Core said that he used drugs, mostly marijuana and crank,
in order to fit in when he was in school. In junior high
school his parents sent him to a therapist because he was
having difficulties academically. He said that he is
currently in good physical shape and is not taking any
medications.

BACKGROUND INFORMATION, Continued:

Mr. Core doe not have any prior criminal record. He says that he deserves to be punished for the instant crime, but that he still can not believe that he is here and wants desperately to be released. He is quite remorseful for the crime that he was involved in.

Mr. Core completed Breaking Barriers, has attended VORG for four months, and continues to be involved in Alcoholics Anonymous. He completed his Silk Screen Trade. In his free time he draws, writes, watches television, and lifts weights. He says he finds it difficult to apply himself if he is not interested in something. He likes to laugh, which he did throughout the interview.

In describing how he has changed during his incarceration, he feels that he has more appreciation for the little things in life, such as flowers. He feels that he no longer has to use drugs or "run wild" and that he has "grown up." He feels that he has sufficient self-control to handle himself and stay out of trouble. When asked how he deals with anger, he responded that he will frequently write a letter in order to express his anger, but then not mail it. Mr. Core went on to describe himself as a person who is harmless and has learned his lesson. "I deserve to be punished, but I am not a criminal, I'm very sorry for what happened and pray all the time. He feels very alone in prison and that he does not fit in. He said that he copes but that it is very hard not knowing when he will get out. He finds it particularly difficult to accept his sentence. He continued to repeat that he did not belong in prison and that he was not a violent person, but only stupid.

## MENTAL STATUS EXAMINATION:

Mr. Core presented as a well-nourished Caucasian male of his approximate age with long hair. He laughed nervously and throughout the interview appearing institutionally unsophisticated and immature for his age. He was very cooperative and pleasant, answering all questions directly. There were no difficulties in orientation, memory, speech or thought processes. His perceptions were somewhat naive. Despite his laughing there seemed to be an underlying depressed mood. He said that he is depressed all the time. There was no indication of psychotic behavior or organicity. Judgment and insight were poor. It is estimated that his intelligence is somewhat lower than average.

**PSYCHIATRIC EVALUATION:**

AXIS     I:   Mixed Substance Abuse, Amphetamine and
              Cannabis, by History.

AXIS    II:   Mixed Personality Disorder, Passive-
              Aggressive, Narcissistic, and Dependent.

AXIS   III:   None.

**PSYCHOLOGICAL CONCLUSIONS:**

The above diagnosis is indirectly related to the instant
offense.  His substance abuse and personality characteristics
predisposed him to the instant offense.  He has great
difficulty accepting his sentence and this interferes with his
ability to adapt to prison.  He has however no prior history
of violence, either in or out of prison.  His violence
potential is considered to be somewhat less than average.
During observation in this institution he has psychiatrically
improved slightly and avoided substance abuse.  In a less
controlled setting such as return to the community this inmate
is considered likely to hold present gains.  His further
adjustment in prison will depend on developing an attitude of
acceptance about his current situation.

**SUGGESTED ACTIONS:**

The inmate should be encouraged to remain disciplinary-free,
improve his academic and vocational skills, and gain insight
into his behavior and motivations through continuing his
attendance in self-help programs.

**RECOMMENDATIONS FOR CLASSIFICATION COMMITTEE:**

As noted in his last Psychological Evaluation for the Board
Review, group or individual therapy would be helpful to this
individual in accepting his situation and avoiding further
disciplinary actions related to work performance.

CAROLYN GALE, Ph.D.

NOTED AND APPROVED:

DANIEL E. THOR, M.D
Chief Medical Officer
CSP-Solano

CORE, STEPHEN M.  D-19109  CSP-SOLANO  3-143L 12-31-93 CG:pl 3

PSYCHIATRIC EVALUATION
FOR THE BOARD OF PRISON TERMS

SUBSTANCE ABUSE TREATMENT FACILITY AND STATE PRISON AT CORCORAN

INTRODUCTION:
Stephen Michael Core, CDC #D-19109 is a 30-year-old (DOB: 07/02/67) male who is serving a Fifteen year to Life Term for Murder, Second Degree. This is Mr. Core's fifth psychiatric evaluation for the Board of Prison Terms. Mr. Core was examined on June 1, 1998, by the undersigned for the sole purpose of a psychiatric examination for the Board of Prison Terms. He is not receiving mental health treatment at this time.

BACKGROUND INFORMATION:
Mr. Core currently is housed in general population. This report is based on a fifty-minute interview with the inmate, a review of his C-File and Unit Health Record.

Mr. Core was born in Ridgecrest, California and raised in Boron, California where his father worked for the Borax Company and his mother drove a school bus. He is the youngest of three siblings. He was from an intact home. He states he was close to his mother but feared his father. His father doted on his older brother who excelled in sports. Mr. Core states he attempted to be competitive with his brother to gain recognition from his father. Mr. Core participated in football for nine years and was a "running back star." He also participated in track. He describes his family life as basically normal. Mr. Core's father died about six years ago (1992). His mother is living. He plans to live with and care for his mother if he should ever be released from prison.

Mr. Core's academic performance was never good. He states he did poorly in traditional academic subjects. However, he has good mechanical ability. Because of his academic difficulty and his small stature, he states he never "fit in" with the popular crowd and often was ridiculed. He began using drugs while in high school. His academics suffered greatly. He attended Continuation High School and dropped out before completion.

Mr. Core admits to use of alcohol and drugs including (but not limited to) speed, LSD and marijuana.

On July 3, 1985, (one day after his eighteenth birthday), Mr. Core and his brother abetted a crime partner in the commission of a robbery resulting in the death of a store clerk/victim. Mr. Core pled to second degree murder. Mr. Core was initially incarcerated in the California Youth Authority on December 10, 1985. He was placed in the California Department of Corrections, CMF-South, on September 22, 1987. Subsequent institutional housing: CSP-Solano 3/92 to 07/12/94; CSP-LAC 07/13/94 to 11/09/97; SATF/SP Corcoran from 11/10/97 to present. While Mr. Core had early disciplinary reports, he has remained disciplinary-free since July 1994.

During this interview, Mr. Core admitted that he had continued to use drugs while incarcerated until September 1997. He admits to lying to the Board of Prison Terms about his drug use. Mr. Core states he can now be honest about his behavior because he has come to terms with the belief that he will never be paroled. He states that by admitting his behavior he feels more "free."

Mr. Core denies any history of psychiatric or psychological treatment. He has participated in Inmate self-help NA Program.

**COPY TO INMATE
VIA CC-1** 6-6-98

NAME: CORE, STEPHEN MICHAEL          CSATF/SP                    DATE: JUNE 1, 1998
         CDC#D-19109

PSYCHIATRIC EVALUATION                                                                              2
FOR THE BOARD OF PRISON TERMS

## INSTITUTIONAL ADJUSTMENT:

Mr. Core, as mentioned previously, has resolved that he will never be released from prison. With this
resolve, he appears to have made a greater adjustment to his situation. He states he no longer feels he has
to lie to those in authority. Thus, he openly admits to lying and drug use while incarcerated. He last used
drugs in September 1997. He attributes his ability to discontinue his drug use to "God." He confessed that
when he attended AA/NA everybody was using. He stopped smoking cigarettes in February 1998. Mr.
Core states of his incarceration, "What happened, I think, was destiny." Mr. Core admits to being present
during the instant offense. He believes he is guilty of murder because he did not stop his partner.
However, he states, "I'm guilty, but I'm not a killer." He explains that he could never kill anyone. As he
has previously, he chalks up his behavior to "stupidity" and a need to "fit in." He states the need to belong
also led to his use of drugs. Since his transfer to SATF/SPC, Mr. Core has been working on Yard Crew.
He occupies his time by playing baseball, basketball, cards, chess and working out three days per week.
He states he calls his mother one to two times per week but tries to be careful about the costs of
telephoning. He states he mother sends him money monthly. Mr. Core believes he has been helpful to
other, younger inmates by attempting to influence them positively (e.g., not use drugs).

Of the instant offense, Mr. Core appears to have accepted his role and lack of ability to respond pro-
socially. He has gained the insight, now, that he had an individual choice to behave differently. He
believed he could have a large quantity of money without the guilt of actually taking it. He recognizes this
was naïve. He now knows that he was as guilty as the man who actually committed the murder. He
appears to feel genuine remorse for the destruction of his victim's life, the victim's family's life, his
family's life and his own life. He appears motivated to make the best of his current circumstance.

When asked what difficulties he might encounter if he were paroled, he stated, "I don't know how to do
taxes." Otherwise, he believes he will have little difficulty adjusting to life outside the institution despite
his failure to have achieved important "developmental tasks." These tasks include milestones such as
maintaining an independent household (rent, insurance, car payments, utilities, intimate relationships,
work requirements, etc.).

## MENTAL STATUS EXAMINATION:

Stephen Michael Core is a thirty-year-old Caucasian male of slight build who appears his stated age.
His primary language is English. Eye contact was adequate. Responses to the examiner were clear,
coherent, and goal-directed. He seemed to be reasonably happy in his current resolve. He frequently was
amused by his apparent growth/adjustment. Mr. Core admits culpability and demonstrated remorse for his
crimes and their consequences. He demonstrated some insight into his selfish and irresponsible behavior.
He has given some thought about alternative actions he might have taken. Vocabulary usage and fund of
general knowledge suggest he is of at least average intellectual ability. There were no gross abnormalities
of thought, no perceptual distortions (hallucinations), and no cognitive anomalies (such as perseveration or
confabulation). There was no evidence of paranoid thinking or delusions. He was oriented to person,
place, and time. There was no behavioral evidence of obsessions or compulsions. There was no
impairment in attention or concentration observed. There were no symptoms of depression or other
affective disorder. He does not admit to suicidal thoughts.

## DIAGNOSTIC IMPRESSION:

AXIS I:    V71.09  Polysubstance abuse in institutional remission (since 9/97)
AXIS II:   V71.09  Deferred
AXIS III:  None known
AXIS IV:   Incarceration
AXIS V:    Global Assessment of Functioning (Current):  80

PSYCHIATRIC EVALUATI_                                                                    3
FOR THE BOARD OF PRISON TERMS

## CONCLUSIONS AND RECOMMENDATIONS:

Mr. Core does not suffer from any psychiatric or psychological illness. Based on this evaluation, if at
large, Mr. Core presents an average level of risk to the safety and welfare of community members (on the
condition he is free from drugs and alcohol use). This is premised on his history of adequate adjustment
prior to the instant offense, no prior history of conduct disordered or violent behavior, feelings of
guilt/remorse for the instant offense, and insight into his psychological vulnerability.


Margaret M. Wall, Ph.D.
Clinical Psychologist, C.F.

**SUBSTANCE ABUSE TREATMENT FACILITY**
**AND**
**STATE PRISON AT CORCORAN**

**PSYCHIATRIC EVALUATION**
**FOR THE BOARD OF PRISON TERMS**
**LIFE-TERM INMATE EVALUATION**
(NEW FORMAT)

## IDENTIFYING INFORMATION

INMATE NAME: Core, Stephen
CDC #: D-19109
DOB/AGE: 7-2-67/ 33 years of age.
CDC Facility: CSATF-SP
Date of Evaluation: 10-10-2000

COPY TO I/M
VIA
CC-1 ON 11-14-00 CD
(date)

Mr. Core is a 33 year-old Caucasian male. He is serving 15 years to life term for a 1985 2nd degree murder of a convenience store shopkeeper. Mr. Core is single and was never married.

## SOURCES OF INFORMATION:
Review of Central File (C-File), Unit Health Record (UHR). Inmate interviewed on 10-10-2000.

## DEVELOPMENTAL HISTORY
There was no conclusive evidence suggesting that Mr. Core had difficulty achieving developmental milestones, but it is suspected that he may have been a slow learner. Mr. Core's academic performance and his assertions about being a slow learner suggest that he may have an Attention Deficit Hyperactivity Disorder and/or a Learning Disorder/Disability.

Mr. Core told the examiner that he experienced considerable difficulty concentrating in school and characterized himself as, "distractible". He also stated that he was "a little hyperactive". He admitted to having trouble sitting still in school for extended periods. He claimed that he generally moved around, "real fast". His academic performance was depicted as poor and he apparently was attending a special education, "remedial" class for slower learners. He claimed that he attended a "remedial" class in high school. He stated that he read some pamphlets on the Attention Deficit Disorder and decided that he "had a little" Attention Deficit problem. The onset of this possible Attention Deficit Hyperactivity Disorder and/or Learning Disability/Disorder is unclear, but it is suspected by the examiner that he may have been laboring with these problems at a very early age.

CORE, STEPHEN      D-19109      CSATF      DATE: 10/10/00

PSYCHIATRIC EVALUATE
FOR THE BOARD OF PRISON TERMS
Page 2 of 8

Mr. Core reported that his father frequently beat him for disciplinary purposes. The inmate stated that his father employed various implements for the beatings (including belts and some heavier solid objects). Mr. Core's report about the discipline he received strongly suggests that he may have been an abused child (physically and emotionally).

Mr. Core's peer and social relationships were also difficult. Mr. Core reported that he did not have girl friends and "just hung-out". He stated that he did not fit in with the smart kids, but seemed to fit with the "druggies". Consequently, he associated with those adolescents who were involved with drugs and were searching for the "ultimate high". A 1985 C-File Social History report revealed that Mr. Core stated that he chose friends his own age, but he was susceptible to negative peer pressure. He claimed that most of is friends were not criminally oriented, but rebellious to parental supervision and guidance. A 1998 BPT psychiatric evaluation in his C-File stated that Mr. Core reported that he did not associate with the "popular students" because of his small stature. His social interactions and peer choices seem to suggest that he had, and may still have, low esteem and a poor body image.

## EDUCATION
A Social History report of 1985 (in the C-File) stated that Mr. Core attended Boron High School and his last date of attendance was in 1983. He attended a "continuation high school program". He apparently left high school in the 12th grade. Mr. Core stated that he quit high school because he was falling behind in his subjects. He denied any truancy or behavior problems. His TABE testing, in 1985, estimated his grade point level to 6.5 years.

In 1986, Mr. Core graduated high school by completing a program in the Department of Youth Authority at Chino, California.

A 1998 BPT psychiatric evaluation in his C-File suggests that Mr. Core's academic performance "was never good". The report went on to indicate that Mr. Core claimed that he had good mechanical ability, but always had trouble with academics. Mr. Also Core claimed that he felt like he never "fit in" with the popular students because of his small stature.

Mr. Core revealed, during the current evaluation interview, that he was always behind in class and was "a little disruptive". He reported that he could not keep up with the other students, but did "all right in remedial class", because the class moved at a slower pace.

## FAMILY HISTORY
The C-File data revealed that Mr. Corer was the third child born to his natural parents. A 1985 Social History evaluation indicated that his parents had been married for 20 years at the time of the report, and the marriage remained intact. The evaluation also reported that inmate lived with parents when he became involved in the life term offense. It was reported that both parents shared the responsibility for raising the children.

CORE, STEPHEN        D-19109        CSATF        DATE: 10/10/00

PSYCHIATRIC EVALUA`.
FOR THE BOARD OF PRISON TERMS
Page 3 of 8

Mr. Core has a sister, approximately in her early 40s, and she is currently living in Arkansas. His father died in 1992. Mr. Core's older brother is serving a life term in prison for his participation in the crime that brought Mr. Core to prison. The inmate's mother is still alive and living in California, presumably in Boron, California.

Mr. Core reported that his father was "a little rough on me—he whooped me, it was good discipline...he whooped me for little dumb things, and he whooped me pretty good...it was just tough love." Mr. Core explained that the "whoopings" (beatings/corporal punishment) he received involved beatings with belts and "whatever he (the father) could grab". Mr. Core eventually stated that his father had beaten him with heavy solid objects from time-to-time.

## PSYCHOSEXUAL DEVELOPMENT/SEXUAL ORIENTATION
No abnormalities or complications reported or documented. His sexual orientation is heterosexual.

## MARITAL HISTORY
Single and never married.

## MILITARY HISTORY
No apparent military history

## EMPLOYMENT/INCOME
A 1985 Social History evaluation in the C-File stated that Mr. Core claimed that he had no vocational education, and his work experience was limited to 2-½ months employment with the "Water District". He earned about $6.00 per hour. This job involved repairing pipes and sewers. He left this job because of his arrest for the life term offense.

## SUBSTANCE ABUSE HISTORY
Mr. Core reported that started using drugs at about 15 years of age. He predominantly used Meta-amphetamines, and claimed that enjoyed this type of drug.

A 1985 C-File Social History evaluation stated that the inmate used "Crank" about 25 times and occasionally used Marijuana. Mr. Core claimed that used Crank "every two weeks". He claimed that he did not need substance abuse treatment.

In 1996, Mr. Core received a Certificate of Achievement for his participation in Narcotic Anonymous.

A 1998 BPT psychiatric evaluation reported that Mr. Core claimed that he used LSD, and admitted to using drugs while in prison. He also claimed that his main motivation for drug use was his "need to belong". Reportedly, he stopped smoking cigarettes in 1998. He stated that he was able to stop using drugs because of "God".

CORE, STEPHEN        D-19109        CSATF        DATE: 10/10/00

PSYCHIATRIC EVALUAT.
FOR THE BOARD OF PRISON TERMS
Page 4 of 8

During his current evaluation interview, Mr. Core claimed "drugs got me in this mess".

There is no indication that the inmate used a controlled substance during the past several years.

## PSYCHIATRIC/MEDICAL HISTORY

The UHR revealed that the inmate has asthma. His asthma apparently started in the 4th or 5th grade, and is now less debilitating. In general, there is no indication of significant medical or mental health problems over the last few years. His insight and judgment appears to have improved. His ability to control maladaptive behaviors also appears to have improved over the past several years.

A 1985, C-File Social History evaluation diagnosed Mr. Core as having an "inadequate personality, unsophisticated". He was characterized as "naïve". There was no evidence at that time of a serious mental or emotional disorder. In addition, there was no evidence of a history of violence before his life term crime.

A 1986 psychiatric evaluation in the UHR file reported that Mr. Core appeared to be "somewhat passive about his acceptance of criminal behavior, and it is possible that he only became involved in the crime as result of brother's strong influence and that of the primary offender" (the one who actually committed the murder).

A 1993 psychological report stated that the inmate needed to gain more insight into his behavior, and become "disciplinary free, and improve his academics and vocational skills before he could be recommended for parole."

A 1997 Mental Health Data Base Note in the UHR file evaluated Mr. Core as "confused, disoriented, withdrawn, agitated, distractible, and depressed. Subsequently, he expressed some suicidal ideation—"begging God to kill him". He denied hallucinations or poor sleep habits.

A 1998 BPT psychiatric evaluation documented that Mr. Core was not receiving mental health treatment. The report stated that "the inmate resolved that he will never be released from prison" and this seemed to give him "a sense of feeling more free". It appeared that this decision helped the inmate improve his adjustment in prison. Hostility towards authority appears to have subsided. Additionally, the report stated that he did not present symptoms that would suggest a clinically significant mental health problem or emotional disorder. The report found no history of a conduct disorder. This report concluded that Mr. Core appeared to present an "average risk" to the safety and welfare of community provided he stays off drugs. The report presented a diagnosis of "Polysubstance Abuse in institutional remission since 9/97, and his GAF (Global Assessment Functioning is estimated to be 80+."

CORE, STEPHEN       D-19109       CSATF       DATE: 10/10/00

PSYCHIATRIC EVALUATIC
FOR THE BOARD OF PRISON TERMS
Page 5 of 8

## RELEASE PLANS

Mr. Core has a viable plan for release. He claims that he can stay with his mother and
help care for the house and work in her antique store. He also claimed that might be able
to work for his neighbor, Ross Construction. His mother sent a letter to the BPT verifying
that her son can work in the business that she developed. She also indicated that her son
can live at home with her.

## CURRENT MENTAL STATUS/TREATMENT NEEDS

Mr. Core was well clean and well groomed. He was neatly dressed. He had numerous
tattoos on both arms and he felt remorseful that he tattooed himself in that fashion. He
claimed that the tattooing was immature. He cooperated with the examiner and seemed to
be trying very hard to be open and honest. He was socially appropriate and friendly. He
smiled spontaneously. He made good eye contract for significant periods. His fine and
gross motor skills were within the normal range. His speech was articulate, coherent, and
audible, though often rapid. . There was no indication of impairment in short and long
term memory. There was no indication of psychotic symptoms or a perceptual disorder.
He was oriented to person, place and time. His affect was of full range and generally
appropriate to the situation and thought content. His mood was somewhat excitable, up-
beat, and cheerful. Thoughts were tangential on occasion, but in the main, his thoughts
were goal directed and logical. The mild tangential thinking could be related to a possible
Attention Deficit Disorder (affecting his ability to concentrate and focus).

Mr. Core should continue to work with Alcoholic and Narcotic Anonymous while in
prison and if he is paroled. He will need to have this support to help him stay away from
drug and alcohol usage. He should also avail himself of psychotherapy/counseling related
to a possible Attention-Deficit Disorder and gain insight into this type of disorder, and
how this disorder can lead to impulsive behaviors and misperceptions (the latter is often
due to difficulties in attending and concentrating). A major priority for the inmate should
be his effort to seek out psycho-diagnostic testing to confirm or disconfirm the possibility
of an Attention-Deficit Hyperactivity Disorder. If a diagnosis of Attention Deficit is
confirmed, he should be evaluated for appropriate medication and related
counseling/psychotherapy. Appropriate medication for this type of condition can improve
one's overall functioning (social, academic, and vocational), and it can significantly help
one control impulsive behaviors. Mr. Core will also need to work on his self image and
obtain support to help him avoid relationships that might encourage him to engage in
maladaptive behaviors, particularly, drug use; drug use is a significant area of
vulnerability for Attention-Deficit Disordered individuals.

## DIAGNOSITC IMPRESSION

AXIS I        304.80 Polysubstance Dependence (in Institutional Remission since 9/97)

CORE, STEPHEN        D-19109        CSATF        DATE: 10/10/00

PSYCHIATRIC EVALUATION
FOR THE BOARD OF PRISON TERMS
Page 6 of 8

R/O 314.00 Attention-Deficit/Hyperactivity Disorder, Predominantly
Inattentive Type.

AXIS II    V7.999 Diagnosis deferred.
AXIS III   None
AXIS IV    Psychosocial stressors, Mild, and in partial remission, due to incarceration.
AXIS V     GAF score of 85.

## REVIEW OF LIFE CRIME

The C-File version of the crime reveals that a Mr. Avila, a short-term acquaintance of the
Core brothers, wanted to buy a motorcycle from Mr. Core's older brother. The two
brothers wanted to buy drugs. The perpetrators did not have the money to make their
desired purchases. Mr. Avila decided to rob a mini mart in Boron, California to get the
money for the purchases. Mr. Avila convinced the Core brothers to help him rob the store
and function as lookouts. Mr. Avila promised to share the stolen money with Core
brothers. Mr. Avila also bragged about his desire to shoot the storeowner. Mr. Avila, clad
in a stocking hose over his head and gloves, entered the store with a shotgun and fatally
shot the storeowner in the face. Mr. Avila left the store with the stolen money. Mr. Core
and his brother were not in the store. The perpetrators left the crime scene. Eventually,
someone reported that Mr. Avila and the Core brothers were involved in the robbery and
shooting, and that Mr. Avila was bragging about killing the storeowner. Mr. Core and the
others involved in the crime were subsequently apprehended. Mr. Core informed the
Sheriff about details related to the crime and the location of weapons and other materials
involved in the robbery/murder The C-File suggests that Mr. Core had pleaded with Mr.
Avila to not shoot the storeowner. It was noted that Mr. Core's assistance greatly aided
the Sheriffs' investigation.

Mr. Core's version of the crime was a follows: Mr. Core claimed that before the crime he
was on drugs all the time. His drug abuse resulted in sleep deprivation and "delusions".
Mr. Core and his brother ran out of money to buy drugs. His brother decided to sell his
motorcycle and shotgun to buy drugs. Mr. Avila wanted to buy the gun and motorcycle,
and did not have the money to make the purchase. Mr. Avila proposed that they rob a
mini mart. Mr. Avila told the Core brothers that they would receive 1/3 of the stolen
money if they helped him rob the store and functioned as lookouts. The Core brothers
provided Mr. Avila with a disguise so that he would not be identifiable, and would not
have to hurt anybody. Mr. Core and his brother positioned themselves outside the market,
and Mr. Avila entered the store armed with a shotgun. Mr. Core stated, "When I saw
Anthony (referring to Mr. Avila) creeping into the store I took off because I saw that he
was crazy". Prior to this, Mr. Core thought that Mr. Avila's bragging about shooting the
storeowner was just "talk", but Mr. Core realized that Mr. Avila did in fact intend to
shoot the storeowner. Mr. Core claimed that he heard the gun discharge "from a distance
of about 100 yards" and he assumed that the storeowner was killed. He ran home. The
perpetrators met at the Core home and divided the stolen money. At the time of splitting
up the money, Mr. Core could only think of the drugs that he was going to be able to buy.

CORE, STEPHEN    D-19109    CSATF    DATE: 10/10/00

Mr. Core expressed remorse for the crime and the suffering of the victim—"he should never have been killed". When Mr. Core saw crime pictures of the victim he thought about the victim's suffering. Mr. Core admitted that he was an accessory to murder, but he claimed that he was not a killer. He does not see himself as a killer, but realizes that this does not absolve him of the murder—I didn't kill anyone, I did go with a killer." Mr. Core acknowledges his guilt because he did not try to stop the murder from happening.

## ASSESSMENT OF DANGEROUSNESS
A 1985 C-File Social History evaluation reported that Mr. Core did not have a criminal record before his involvement in the life term crime. The Boron Sheriff's Department stated that Mr. Core and his brother were productive and quite normal—both participated in sports and various school activities. The Sheriff's Department did acknowledge that an officer cited Mr. Core and his brother for possessing less than an ounce of Marijuana sometime before the murder/robbery.

There was no evidence to suggest that Mr. Core participated in violent actions before the crime that resulted in murder.

The C-File stated that Mr. Core received 6 CDC 115s from 1992 through 8/2000. The majority of CDC 115s were for work related infractions—poor work performance, work slow down activity, failure to show for job assignment, etc. The CDC 115 in 8/2000 was "for possession of dangerous property". Mr. Core was found to be in possession of straight razor blade that was about 1 ½ inches long while he was in his cell. He claimed that he did not remember where he got it from, and he just used it for hobbies.

Mr. Core's background information, before his involvement in the life term crime, did not indicate that he was a potential danger to others, except for his involvement with drugs. His behavior in prison, for the most part, has not suggested that he is danger to others. There was only one incident where he was in possession of a potentially dangerous implement- razor blade. The reason he possessed the razor blade is not clear, and there was no indication that he intended to use the razor blade for any purpose other than what he claimed—to work on hobbies. His history does not suggest that he has or had a serious mental health problem that would make him a danger to others. The only factors that could be used to predict his level of potential dangerousness would be his history of drug abuse (including the types of drug abused) and his involvement in the murder/robbery.

It appears that Mr. Core is remorseful about the crime, his participation, and the victim's suffering. It also appears that he realizes the extent to which his drug abuse contributed to his poor judgment and impulsiveness, and how these related to crime of murder. Mr. Core seems to motivated towards rehabilitating himself--he has apparently been drug free for the past 3 years. There appears to be no indication that he has been involved in violent behavior while imprisoned. His religious beliefs appear to be guiding him in a positive direction that reduces his potential for involvement in crime.

CORE, STEPHEN        D-19109        CSATF        DATE: 10/10/00

PSYCHIATRIC EVALUATION
FOR THE BOARD OF PRISON TERMS
Page 8 of 8

This examiner believes that Mr. Core is in a good position to follow through with a successful parole if he continues to remain drug free and seeks further treatment. At this time, he appears to be an average to less than average risk of committing a dangerous act in prison and in the community outside of prison. Of course, if he returns to drug use, this risk factor will rise significantly above the average mark.

## COMMENTS/RECOMMENDATIONS

Mr. Core's greatest challenge will be his ability to control desires and impulses that might tempt him to engage in drug or alcohol use/abuse. He will need a supportive social and therapeutic structure that will help him deal with such temptations. These supportive structures could be provided by family support and his indefinite involvement with a drug treatment /prevention process.

Respectfully submitted,

**J. KATZMAN, Ph.D.**
Licensed, Clinical Psychologist



SUBSTANCE ABUSE TREATMENT FACILITY
AND
STATE PRISON AT CORCORAN

PSYCHIATRIC EVALUATION
FOR THE BOARD OF PRISON TERMS
(NEW FORMAT)

## IDENTIFYING INFORMATION

INMATE NAME: Core, Stephen
CDC #: D-19109   —
DOB/AGE: 7-2-67/34 years of age
CDC FACILITY: CSATF-SP
Date of evaluation: 3/7/02

Mr. Core is a 34-year old single, Caucasian male. He is covered with tattoos. He claims affiliation with the Catholic Church. He also said, he has been reading the Urantia Book and finds it fascinating.

## SOURCES OF INFORMATION
Review of Central File (C-File), Unit Health Record (UHR). Inmate interviewed on 3/7/2002.

## DEVELOPMENTAL HISTORY
Mr. Core reports no prenatal or perinatal concerns. There is no conclusive evidence that would suggest any developmental abnormalities either. Mr. Core reported that his language and motor development were on schedule.

He indicated that as a child he had difficulty living up to his father's expectation. His father frequently disciplined him by beating him. There is every indication that his father went to excess in disciplining him and that the discipline often turned into abuse. It appears that he did not fare much better in school either. According to his account, on several occasion he was "thrown in the back of the class in a cardboard box." Other children were not kind to him, in that, they picked on him and considered him slow and stupid.

Being an Altar boy for seven years gave Mr. Core some grounding and helped him cope with adversities. Having had a pet dog that he liked also made life more bearable. Unfortunately he lost daisy, his dog, to distemper. He reported that one day he found him laying in the back yard "all swelled up and covered with ants." He said, he had a difficult time dealing with this and cried a lot over the death of this animal as he buried him in the desert.

CORE, STEPHEN        D-19109            CSATF        DATE: 3/7/02

PSYCHIATRIC EVALUATION
FOR THE BOARD OF PRISON TERMS
Page 2 of 6

The abusive discipline continued well into his teenage years. On one occasion, he was beaten "senseless" by his father for not wanting to play baseball. He said, that his father beat his head against the wall till he collapsed in a confused stupor. This time he ran away to live in a friend's garage. His parents were looking for him and when they finally found him his father cried.

He reported that his sister experimented with Marijuana first in the family. The initial idea of drug use in his mind emerged because he looked up to her and wanted to experience what she had experienced. Unfortunately his experimentation turned into a habit and he became drug dependent. Drugs offered the artificial high he seldom got naturally because of all the negativity in his life.

## EDUCATION
Mr. Core attended North Edward High School in Boron. He quit school in 12th grade without graduating. He admitted that he never felt smart in school and had difficulty keeping up with his classmates. Part of the time he was placed in special education classes where he performed somewhat better.

As far as his friends were concerned he stated that he did never fit in with the popular students. His friends were rebellious teenagers who challenged parental authority by experimenting with drugs. Once he got hooked on drugs his overriding concern was to get money for the "next high." Eventually this habit prompted him to get involved in the commission of life crime. He wanted quick cash for drugs, and it looked like taking up the offer of assisting in the robbery would provide that.

It was not until after his incarceration that Mr. Core completed high school. In 1986 he graduated by finishing a program in the Department of Youth Authority (CYA).

## FAMILY HISTORY
Mr. Core is the fourth child born to the marriage of Carole and Anita Core. His sister, Valerie Core has never had any criminal history. His brother Neil, one of his crime partners, was sentenced to prison and remains incarcerated for the life crime. One brother, the first born in the family, died of "crib death" due to lung problems.

Mr. Core came from an intact family. It appears that his father's expectation for him exceeded his abilities. Great disappointment occurred as a result of mismatch of expectations for both the father and for the son. His father wanted his son to develop the right spiritual values and guided him to participate in church activities as an altar boy. He also wanted his son to excel in sports and do well academically. His authority was administered and enforced through beatings with little understanding of his son's ability or needs. The end result was a rebellion against parental authority and disobedience to parental admonitions and values.

CORE, STEPHEN          D-19109          CSATF          DATE: 3/7/02

PSYCHIATRIC EVALUATION
FOR THE BOARD OF PRISON TERMS
Page 3 of 6

After the incarceration of Mr. Core and his brother, their father "escaped to work." Mr.
Core reported that his father took on more and more assignments and eventually
undertook a job that involved cleaning a polluted tank. According to Mr. Core's account,
his father and three other people who worked on the same project all died of bone cancer
because of lack of proper safety measures and decontamination. His mother is still alive
and doing well "running an antique shop." Mr. Core expressed great emotions and
compassion towards his mother and he is empathic towards her suffering due to her sons'
incarceration. He is very sorry about the pain his imprisonment caused his family,
especially his mother.

## PSYCHOSEXUAL DEVELOPMENTAL AND SEXUAL ORIENTATION
Mr. Core is a heterosexual male who experienced his first coitus at 12-years of age with
another 12 year old person.

## MARITAL HISTORY
None.

## MILITARY HISTORY
None.

## EMPLOYMENT /INCOME HISTORY
Mr. Core has held no jobs prior to incarceration except a temporary part time job helping
his father work for the water district. He stated that he has worked only when needed on
an hourly basis.

Post incarceration history involves training in Vocational cabinet making, Vocational
Silk screening and he also completed a test covering Manual transmissions and power
trains.

## SUBSTANCE ABUSE HISTORY
Mr. Core started to use illegal substances as a teenager. He stated during the interview
that he tried everything. He developed a preference for using Marijuana and speed. He
continued to use drugs even after incarceration and voluntarily gave all drug use up in
1988. He attributes the change of drug use to returning to spirituality and to reactivating
the spiritual beliefs he learned as a child.

He also attended N/A for several years and in 1996 he received a Certificate of
Achievement for his participation.

## PSYCHIATRIC AND MEDICAL HISTORY
Medical history reveals problem with asthma that started in the fourth or in the fifth
grade. Mr. Core reports that current difficulty with asthma is minor.

CORE, STEPHEN          D-19109          CSATF          DATE: 3/7/02

PSYCHIATRIC EVALUATION
FOR THE BOARD OF PRISON TERMS
Page 4 of 6

Psychiatric history involves various comments referring to Mr. Core as immature, unsophisticated, naïve, confused, withdrawn, agitated, distractible and depressed. His social interactions and peer choices suggest that he has and still may have low self-esteem and poor body image.

In the context of Mr. Core's history all of the above comments about his psychological state have a certain degree of validity and merit to them. However, it appears that Mr. Core has matured during his incarceration and continues to grow in a positive way. He seems to have made great progress in completely rehabilitating himself in the area of drug use.

## PLANS IF GRANTED RELEASE
Mr. Core stated that upon release he plans to live with his mother, support himself by working, and will pay taxes. His mother owns an antique shop and Mr. Core may pursue a career in woodworking that is related to restoring antiques.

## CURRENT MENTAL STATUS AND TREATMENT NEEDS
Mr. Core presented as well groomed friendly and open. He was oriented to person, place time and situation. His long and short-term memory appeared average. He was alert and cooperated with this interviewer to the best of his ability. His mood was appropriate for the situation, and his affect was rather excitable. He denied any homicidal or suicidal ideation. His thought process and content seemed free of any serious psychopathology.

Mr. Core is still struggling with the concept and reality of his incarceration and is trying to reconcile reality with his values and perceptions. According to his account he had no clue about the magnitude and implications of the crime he would be accused of because of his peripheral involvement in the life crime. In his mind, he just wanted the money for the next "high" and it appeared to him that he could get it if he accepted the role of the "lookout." He never considered the idea that a life might be taken in the process. He said that he could never kill anyone. He admits that his stupidity, need for "dope money," and an inability to say no landed him in prison.

## DIAGNOSTIC IMPRESSION
AXIS I:      304.80 Polysubstance dependence in institutional remission.

AXIS II:     V7.999 Diagnosis deferred

AXIS III:    Asthma

AXIS IV:     Incarceration

AXIS V:      GAF 85

PSYCHIATRIC EVALUATION
FOR THE BOARD OF PRISON TERMS
Page 5 of 6

## REVIEW OF LIFE CRIME

"Andy Avila wanted to buy my brother's motor cycle and his 20 gauge sawed off shot gun. He did not have the money to pay for it. He wanted to rob a store to obtain the money to pay for the motor cycle.

My mom and dad went to Arkansas, Andy knew that and he came over to our house. He said, 'I will do it with or without you.' 'If you come to be on the lookout, I will give you a third.' He talked about blowing away the clerk before and did not act on it. His talk was not serious. He wore a pair of pantyhose on the way there. I tried to talk him out of it. I watched him open the door of the store and I started running down the street. It was dark and I sat a distance away listening and I heard the sound of a gunshot. I ran home and locked the door. My brother was hiding in the desert about twenty minutes away from the store. Next thing I heard was banging on the door and I saw Andy and my brother. Andy gave me $300. He gave the gun to my brother who hid it in the attic. Why did you shoot him you idiot, I asked? 'Because he saw my tattoos, he said.' 'Do not tell anyone about it. If you do I'll knock you off too, Andy said.' I stayed away from him, blew the money on drugs. I confessed to the police, I assisted them in the investigation and they charged me with first degree murder."

## ASSESSMENT OF DANGEROUSNESS

Mr. Core does not have any juvenile or adult crime record prior to the life crime. He was brought up in a small town with traditional values. As a teenager he experimented with drugs and became dependent on them. Even though he was legally and physically 18-years-old his mental age could have been fifteen or less at the time of the commission of the life crime. Emotional development and maturation usually slows down or halts around the time addiction starts. Judgment is usually impaired. An addicted individual is driven to achieve the next "high" at any cost. Mr. Core wanted money for the next high and became receptive to the influence of a potential murderer. Mr. Core did not have the emotional or intellectual reserve to do what was "right." He aided in committing and initially covering up the life crime. Mr. Core does not look at himself as a killer. He stated in prior records and during this interview that he could not kill another human being.

The C-File indicates that Mr. Core received 6 CDC 115s between 1992 and 2000. On 4/4/2000, cell search produced a straight razor blade, approximately one and a half inches long. There is no indication that Mr. Core intended to use this razor blade for any other purpose than for his hobbies. On 1/21/2002 he received another CDC 115 for using an inmate manufactured tattoo gun for the purpose of tattooing his cellmate. Mr. Core denied tattooing his cellmate. He said the tattoos on his cell were not fresh.

There is nothing in Mr. Core's criminal history that would suggest that he would pose a danger to others. It appears that he was induced by two older people to assist in carrying out the life crime. His involvement with drugs impaired his judgment and his desire for

CORE, STEPHEN        D-19109        CSATF        DATE: 3/7/02



PSYCHIATRIC EVALUATION
FOR THE BOARD OF PRISON TERMS
Page 6 of 6

the next "high" made him vulnerable to the robbery plan. Mr. Avila promised 1/3 of the loot to him and this meant instant cash for drugs. In his mind, Mr. Core was planning to assist Mr. Avila in a tangential way by being on the lookout for a robbery plot but not for a murder plan.

He is very sorry about what happened that night. The robbery plan turned into murder and that was not Mr. Core's initial perception of the situation. Past records indicate that it took him a long time to understand that under the law it was not only the triggerman that was guilty of murder but he was charged with murder as well for assisting him.

Mr. Core has no serious mental illness and he is not on any psychotropic medication. His mental status exam indicates that his intelligence falls in the average category. He is motivated to do well, if paroled. He has a viable plan for employment. He has expressed great caring and love for his mother and would not want to bring anymore "suffering" into her life. He is very much aware of the precipitating factors that contributed to his involvement in the life crime. It is anticipated that his dangerousness to another person or to society is minimal, provided he associates with law-abiding citizens and remains active in N/A

## CLINICAL OBSERVATIONS/COMMENTS AND RECOMMENDATIONS

1.) Avoid impulsive decisions based on the enthusiasm of the moment.
2.) Review and be ready to list all preventive steps for relapse.
3.) Avoid high risk situations and places
4.) Associate with law abiding citizens
5.) If in doubt seek out community resources for input and guidance.

It is suggested that the condition of parole involve continued participation in N/A. If paroled, psychotherapy/counseling would be beneficial for several months during the adjustment period, due to lengthy imprisonment. Mr. Core is also encouraged to keep up his interest in religious studies, as this has been a vehicle of transformation for him in the recent past.

Respectfully submitted,

*Katharine Wilson, PhD.*

Katharine K. Wilson, Ph.D.
Licensed, Clinical Psychologist

CORE, STEPHEN          D-19109          CSATF          DATE: 3/7/02

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
JANUARY 2004 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
NOVEMBER 7, 2003

This is an updated psychological evaluation for the Board of Prison Terms on inmate Stephen Core, CDC# D-19109. This report is based on a personal clinical interview of the inmate on 11/07/03. Additionally, in preparation for this report, the Central file, unit health records, and the previous extensive psychological assessment submitted by Dr. Catherine Wilson were reviewed. This clinical interview and the review of all pertinent documents were for the express purpose of preparing this updated report.

Inmate Core is a 36-year-old, single, Caucasian male whose date of birth is 07/02/67. Physical tattoos are obvious. His stated religious affiliation is Catholic. He denied the use of any nicknames or aliases.

Since his last formal psychological evaluation for the Board of Prison Terms, inmate Core has continued to program well within a correctional setting. He has now served over 18 years of his sentence, and recently completed landscaping certification. Additionally, inmate Core has worked extensively with small engines.

Two years ago, Dr. Wilson assigned a low risk factor to inmate Core, both within a controlled institutional setting, and within the community, predicting that risk remains no higher than the average citizen. No event in the past two years serves to elevate this risk prediction, and inmate Core remains a suitable, low-risk candidate for parole consideration. He does not have any serious mental disorder requiring treatment, further reducing community risk.

Inmate Core explained that his mother has recently moved to Arkansas, and following release, he would like to reside with her. He has documented vocational skills, and his parole plans remain realistic. Due to an acknowledge history of prior polysubstance abuse, it is recommended that any parole consideration include a condition for total alcohol and drug abstention.

E. W. HEWCHUK, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad

SENT TO VM ON 2-27-04





RECEIVED

JUL - 3 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
Northern District of California

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVENUE
SAN FRANCISCO, CA. 94102

UNITED STATES POSTAGE

$ 04.80⁰

02 1M
0004229613    JUL 02 2008
MAILED FROM ZIPCODE 93960

4/1/08

C/O. E. Beamon

Do Not Seal Without $350 Check
for filing fee. Thank You!